IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CONNIE LYNN SPIVEY, as Next Friend and attorney-in-fact of ROBERT DANIEL SPIVEY; | § § § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| v. | § | 1:25-cv-1667 |
| | § | |
| REEVES COUNTY, TEXAS HEALTH AND HUMAN SERVICES COMMISSION, CECILE ERWIN YOUNG, NATALIE GABALDON, DYLAN MONTANEZ, JUAN MUNOZ, JAMES THOMAS, MARIANA ARPERO, ASHLEY DIAZ, XAVIER MARTINEZ, IRVING MOLINA, KARLA MUNOZ ZUBIA, ERIKA SOLER, ESTRELLA VASQUEZ, SUANY CASTILLO-SOLANO, JACKSON STEINER, ISAIAH JURADO, JUSTICE PURCEL, YVONNE VALLES, ALBA SAENZ, SHONAH LOZANO, and DEFENDANTS DOE 1–30; | § § § § § § § § § § § § § § § § | JURY DEMANDED |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Connie Lynn Spivey, in her capacity as Next Friend and attorney-in-fact of ROBERT DANIEL SPIVEY, files this 42 U.S.C. § 1983, Americans with Disabilities Act (ADA), and Rehabilitation Act of 1973 (Rehab Act) lawsuit against Defendants Reeves County, Texas Health and Human Services Commission, Cecile Erwin Young, Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Justice Purcel, Yvonne "Bonnie" Valles, Alba Saenz, Shonah Lozano, and Defendants Doe 1–30 because their deliberate indifference and discrimination against him as a result of his disabilities caused him permanent injuries. Plaintiff would show the Court and the Jury the following in support thereof:

# I.    PARTIES

**A.    PLAINTIFF**

1.    Plaintiff Connie Lynn Spivey is the natural mother and Power of Attorney of Robert Daniel Spivey, a disabled and incapacitated former prisoner in the Reeves County Jail. She is a resident of Reeves County, Texas.

**B.    DEFENDANTS**

2.    Reeves County, Texas, is a political subdivision of the State of Texas. Currently, and at all relevant times, the County owns and operates the Reeves County Jail; employs and compensates the staff of the jail; supervises contract workers at the jail; and is charged with ensuring that, at all times, the jail remains in compliance with federal and state law. The County is a recipient of federal funds. The County may be served with process through the County Judge Leo Hung, 100 E. 4th St., Suite 104A, Pecos, Texas 79772. **Service is requested at this time.**

3.    Texas Health and Human Services Commission (HHSC) is an agency of the State of Texas. HHSC is responsible for owning, operating, and employing staff at state hospitals which provide, among other functions, court-ordered competency restoration services for pretrial detainees who are determined to be incompetent to stand trial (IST). HHSC is also responsible for administering and funding crisis and inpatient mental health services both inside and outside the state hospital system, including by funding crisis mental health hospital beds allocated to local mental health authorities to use for their clients. HHSC is a recipient of federal funds. HHSC may be served with process at its headquarters at 4601 N. Guadalupe in Austin, Texas 78751. **Service is requested at this time.**

4.    Cecile Erwin Young is and has been the appointed Executive Commissioner of the Texas Health and Human Services Commission since August 14, 2020. As Executive

Commissioner, Defendant Young is ultimately responsible for ensuring that HHSC is in full compliance with federal and state law, as well as HHSC's internal rules, regulations, and policies. At all relevant times, Defendant Young was responsible for "administering human services programs regarding mental health, including: administering and coordinating mental health services at the local and state level; operating the state's mental health facilities," and "designat[ing] the state hospitals to which persons with mental illness from each district shall be admitted." TEX. HEALTH & SAFETY CODE § 1001.072 and § 552.001. Defendant Young is sued in her individual, personal capacity. At all relevant times, Defendant Young acted under color of law. She may be served with process at 4601 N. Guadalupe in Austin, Texas 78751. **Service is requested at this time.**

5.      Natalie Gabaldon was a Sergeant at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Natalie Gabaldon acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

6.      Dylan Montanez was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. He is sued in his individual, personal capacity. At all relevant times, Dylan Montanez acted under color of law. He may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever he may be found. **Service is requested at this time.**

7.      Juan Munoz was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. He is sued in his individual, personal capacity. At all relevant times, Juan

Munoz acted under color of law. He may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever he may be found. **Service is requested at this time.**

8.    James Thomas was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. He is sued in his individual, personal capacity. At all relevant times, James Thomas acted under color of law. He may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever he may be found. **Service is requested at this time.**

9.    Mariana Arpero was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Mariana Arpero acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

10.    Ashley Diaz was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Ashley Diaz acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

11.    Xavier Martinez was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. He is sued in his individual, personal capacity. At all relevant times, Xavier Martinez acted under color of law. He may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever he may be found. **Service is requested at this time.**

12.    Irving Molina was a Sergeant at the Reeves County Jail and employed by Reeves County at all relevant times. He is sued in his individual, personal capacity. At all relevant times,

Irving Molina acted under color of law. He may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever he may be found. **Service is requested at this time.**

13.    Karla Munoz Zubia was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Karla Munoz Zubia acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

14.    Erika Soler was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Erika Soler acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

15.    Estrella Vasquez was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Estrella Vasquez acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

16.    Suany Castillo-Solano was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Suany Castillo-Solano acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

17.    Jackson Steiner was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. He is sued in his individual, personal capacity. At all relevant times, Jackson Steiner acted under color of law. He may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever he may be found. **Service is requested at this time.**

18.    Isaiah Jurado was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. He is sued in his individual, personal capacity. At all relevant times, Isaiah Jurado acted under color of law. He may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever he may be found. **Service is requested at this time.**

19.    Justice Purcell was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. They are sued in their individual, personal capacity. At all relevant times, Justice Purcell acted under color of law. They may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever they may be found. **Service is requested at this time.**

20.    Yvonne "Bonnie" Valles was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Bonnie Valles acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

21.    Alba Saenz was a jailer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Alba

Saenz acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

22.     Shonah Lozano was a jailer, a licensed vocational nurse (LVN), and the medical officer at the Reeves County Jail and employed by Reeves County at all relevant times. She is sued in her individual, personal capacity. At all relevant times, Shonah Lozano acted under color of law. She may be served with process at the Reeves County Jail, 500 S. Oak Street, Pecos, Texas 79772, or wherever she may be found. **Service is requested at this time.**

23.     Defendant Does 1–30 are unknown persons at the jail who were employed or contracted to work at the Reeves County Jail at all relevant times. They may be served at 500 S. Oak Street, Pecos, Texas 79772. Each Doe Defendant is sued in their respective individual, personal capacities. At all relevant times, each Doe Defendant acted under color of law.

## II.     JURISDICTION AND VENUE

24.     This Court has jurisdiction over Plaintiff's federal question claims brought under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and the Rehabilitation Act (29 U.S.C § 794), pursuant to 28 U.S.C. § 1331 and § 1343.

25.     The Court has personal jurisdiction, as all Defendants at all relevant times were employed in the Western District of Texas.

26.     HHSC and Defendant Young reside in and made all relevant decisions in Austin, Texas.

27.     As all relevant events occurred within the Western District of Texas, venue is proper in this Court pursuant to 24 U.S.C. § 1391(c).

## III.     FACTS

28.     Robert Daniel Spivey was arrested and detained in the Reeves County Jail on or

around April 30, 2022. At the time of his booking into the Reeves County Jail in April 2022, Mr. Spivey had been diagnosed with and was experiencing symptoms of schizophrenia, including hearing voices. Though Mr. Spivey's mental illness was severe and impaired many of his activities of daily living, he was physically healthy and able to walk, bathe, and dress on his own.

29.     While he was briefly transferred from Reeves County Jail to other Texas county jails during 2022, he remained confined in the Reeves County Jail continuously from at least November 7, 2022 until January 2024.

30.     The Reeves County Jail is a small jail, confining only around 35-45 prisoners at any given time between November 2022 and January 2024. As a result of the jail's small size, most jailers at the jail, including each of the Defendant Jailers named and discussed herein and the Defendant Does, regularly interacted with and were familiar with the pre-trial detainees who, like Mr. Spivey, stayed confined in the jail for several months.

31.     Immediately upon his booking into the Reeves County Jail on April 30, 2022, Mr. Spivey was identified by the jailers as having severe mental illness. He answered "yes" to several of the mental health and disability screening questions, told the booking jailer that he heard audible voices, and was a positive match on the Continuity of Care Query ("CCQ").

32.     The CCQ is a statewide database that Texas jailers are mandated to search each time a prisoner is booked into a jail to identify whether the prisoner has ever been served by a local mental health authority in Texas. Positive CCQ matches presumptively identify a detainee as having a mental illness.

33.     Because Mr. Spivey was a positive CCQ match and endorsed hearing voices, he was evaluated by an employee from the West Texas Centers on May 2, 2022.

34.     The West Texas Centers are the local mental health authority ("LMHA," formerly the "MHMR authority") for Reeves County and are responsible for conducting crisis screenings of prisoners with mental illness who are suicidal or identified as a danger to themselves or others as a result of their mental illness. The West Texas Centers also contract with Reeves County to provide the regular mental health services at the Reeves County Jail.

35.     If a prisoner in the Reeves County Jail was suffering from mental illness that made them a danger to themselves or others such that they required immediate inpatient psychiatric hospitalization, the West Texas Centers had to assess the detainee and was the entity with the authority to have the detainee admitted to an inpatient psychiatric hospital operated, administered, and/or funded by HHSC.

36.     While some jails in Texas have the ability and authority to administer forced psychotropic medications pursuant to a court order to certain prisoners who refuse mental health treatment, Reeves County Jail is not one of them.

37.     Accordingly, if a prisoner with mental illness in the Reeves County Jail refused treatment and became dangerous to himself or others such that he required forced psychiatric treatment, only an inpatient psychiatric hospital operated, administered, or funded by HHSC could provide that involuntary treatment after the West Texas Centers arranged their admission.

38.     West Texas Centers did not have an office at the Reeves County Jail. Instead, its employees traveled to the jail for pre-scheduled routine mental health appointments as well as crisis assessments or provided these services by telehealth.

39.     Accordingly, the only way for anyone at the West Texas Centers to become aware that a detainee was experiencing a mental health crisis, needed to be evaluated, and required

immediate inpatient psychiatric hospitalization was for the jail to notify them that a detainee was in crisis.

40.    Throughout May and early June 2022, Mr. Spivey reported to jailers, including but not limited to Defendant Sergeant Irving Molina, that he was hearing voices giving him commands and that his mind was being controlled by others.

41.    On or around June 4, 2022, Mr. Spivey again reported hearing voices to Defendant Sergeant Irving Molina, reported his mind was being controlled by others, and threatened suicide.

42.    Thus, by June 2022, Defendant Molina actually knew that Mr. Spivey had a significant mental illness/disability that was impairing major life activities including cognition, perception, and the normal workings of his brain.

43.    Jailers contacted the West Texas Centers who evaluated Mr. Spivey, approved the jail keeping him on continuous suicide watch for several days, and changed his psychotropic medications.

44.    In July 2022, after Mr. Spivey continued to hear voices commanding him to hurt himself or others, he injured two jailers at the Reeves County Jail. He reported to other jailers that the voices in his head were telling him that it was the Reeves County Sheriff's Department that was trying to control his mind through "remote neural monitoring" and that people were trying to kill him. Mr. Spivey reported to these jailers that he harmed the two officers to make them stop planting thoughts in his mind.

45.    On information and belief, the officers Mr. Spivey made these statements to included several of the Defendants and Defendant Does. Having heard Mr. Spivy make these statements, each of these Defendants actually knew and recognized that Mr. Spivey had a severe mental illness.

46.     On information and belief and because the Reeves County Jail is so small, Mr. Spivey's attack on the two jailers as well as the fact that he heard voices commanding him to hurt them was discussed amongst jailers and was well known, including by each of the individual Defendants and the Defendant Does.

47.     Thus, by the end of July 2022, each of these Defendants and Defendant Does actually knew that Mr. Spivey had a significant mental illness/disability that was impairing major life activities including cognition, perception, and the normal workings of his brain. Indeed, it was obvious from Mr. Spivey's statements and reasons for the attack.

48.     On or around August 26, 2022, Mr. Spivey was transferred to the Mitchell County Jail.

49.     He returned to the Reeves County Jail on November 7, 2022. Because he was being re-booked, he was readministered the mandatory mental health screening.

50.     Defendant Sergeant Natalie Gabaldon conducted the screening. Mr. Spivey told Defendant Gabaldon that he had schizophrenia, received mental health services at "MHMR," heard voices that commanded him to do "crazy" things, and that law enforcement was trying to control his mind through electromagnetic frequencies. Officer Gabaldon also identified that Mr. Spivey was a positive CCQ Match. Thus, by November 7, 2023, Sergeant Gabaldon recognized and actually knew that Mr. Spivey was a person with severe mental illness/disability that was impairing major life activities including cognition, perception, and the normal workings of his brain.

51.     Defendant Sergeant Gabaldon emailed this information to the West Texas Centers and Reeves County Jail Defendant LVN Shonah Lozano, among others.

52.     When Mr. Spivey was re-booked back into the jail on November 7, 2022, he was placed on suicide watch and housed in a single cell as he reported voices were continuing to tell him to harm others.

53.     West Texas Centers conducted a crisis assessment, modified Mr. Spivey's psychotropic medications, and approved his staying on suicide watch.

54.     Between November 2022 and July 2023, Mr. Spivey remained in the Reeves County Jail. During these six months he took psychotropic medications at times and refused them at times.

55.     At some point on or before January 2023, Mr. Spivey's mental health marginally improved, and he was moved back into the general population of the jail. Mr. Spivey continued to tell jailers, including several of the Defendant jailers, that he heard voices and that law enforcement was trying to control his mind.

56.     In May 2023, Mr. Spivey was found incompetent to stand trial (IST) and put on a years' long waitlist for competency restoration services. In the meantime, he was ordered to remain confined in the Reeves County Jail and the jail remained responsible for his ongoing mental health and medical care.

57.     The waitlist for competency restoration services was so long due to the longstanding policy decisions of HHSC and Defendant Cecile Young.

58.     HHSC and Defendant Young are responsible for providing timely competency restoration services to everyone found incompetent to stand trial by Texas State criminal courts.

59.     For years, HHSC and Young have chosen not to provide enough inpatient competency restoration services, leading to an enormous backlog of patients waiting to be admitted

as an inpatient at state hospitals or private hospitals with competency restoration programs funded and administered by HHSC.

60.     HHSC and Young have both known HHSC lacked sufficient capacity for inpatient psychiatric care, including for competency restoration services, based on their own contracted estimates of need and their own waitlists year after year since 2006.

61.     The total HHSC waitlist in June of 2014 had about 170 incompetency detainees. In February 2016, more than 380 detainees were on HHSC waitlists for competency restoration services. By December 31, 2022, over 2,500 detainees were kept waiting by HHSC. This total number dropped slightly by May 2023, with 2,424 on the waitlist.

62.     When a State criminal court finds a criminal defendant incompetent to stand trial, the State is required to put their criminal proceedings on hold and the incompetency detainee must remain confined until they attain competency, unless the criminal court specifically finds that they can be adequately and safely treated in the community.

63.     In order to find a criminal defendant is incompetent to stand trial, a Texas State criminal court must first appoint an expert who is a psychiatrist or psychologist licensed by the state of Texas to evaluate the defendant and issue a report to the criminal court including whether the defendant is a person with mental illness or intellectual disability.

64.     Under Texas law a person is incompetent to stand trial if they lack a sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding or a rational as well as factual understanding of the proceedings against them.

65.     In practice, almost all criminal defendants found incompetent to stand trial in Texas are incompetent because of their mental illness while a small minority have intellectual disabilities or other cognitive disabilities like dementia. Mental illness, intellectual disabilities, and other cognitive impairments are all disabilities.

66.     In contrast to the procedure for disabled incompetency detainees, the State does not halt criminal proceedings against detainees who are not disabled so they can await competency restoration.

67.     For patients like Mr. Spivey whose incompetency was the result of his mental illness and who was charged with an aggravated assault, the only option to restore competency is to be admitted to a maximum security state hospital operated by HHSC for inpatient restoration services.

68.     State law required that detainees like Mr. Spivey be committed for not longer than 120 days, but that time period does not begin to run until the person is actually admitted to a competency restoration program at an HHSC mental health facility.

69.     Over 90% of detainees who are actually sent to a state hospital achieve competency restoration. As part of the process of restoring competency, state hospitals first achieve psychiatric stabilization.

70.     Due to HHSC and Young's policies, the waitlist for Maximum Security Unit (MSU) detainees like Mr. Spivey had an average wait time of 710 days at the end of May 2023.

71.     If HHSC and Young had not presided over a system that routinely failed to provide timely competency restoration services to thousands of disabled Texas detainees, Mr. Spivey would likely have been transferred out of the jail to an inpatient restoration service during June 2023, and likely would have achieved competency by October 2023.

72.     HHSC and Young knew that detainees like Mr. Spivey would needlessly suffer in jail during their wait for competency restoration services, and many would even die as a result of the wait due to psychiatric decompensation in jail.

73.     HHSC and Young knew that 54 incompetency detainees died while on the state hospital waitlists between September 2018 and December 2023.

74.     HHSC and Young also knew that the criminal cases of detainees like Mr. Spivey would drag on longer than the cases of non-disabled, competent detainees whose criminal cases were not

stayed. HHSC and Young knew that, as a result, incompetency detainees—all of whom are disabled—would be kept in jails far longer than their non-disabled peers.

75.     HHSC and Young also knew that as a result of the lengthy delays of the disabled incompetency detainees' criminal cases while they waited for competency restoration, their criminal cases would suffer—witnesses would disappear and memories would fade such that their criminal cases would be harmed in ways that non-disabled defendants' cases were not.

76.     Despite this, HHSC and Young continued to administer a system that needlessly delayed competency restoration services across the state.

77.     Thus, rather than starting to restore competency and likely doing so before the end of the year, Mr. Spivey was relegated to waiting on HHSC's list behind hundreds of other detainees and was still on HHSC's and Young's waitlist for competency restoration services through at least the end of January 2024.

78.     On July 23, 2023, Defendant Officer Irving Molina sent a memo to Defendant LVN Lozano, Defendant Sergeant Gabaldon, and other jailers that he noticed abnormal behavior from Mr. Spivey that he attributed to Mr. Spivey's well-known mental illness. He noted that he usually had good rapport with Mr. Spivey but that since July 21, 2023, Mr. Spivey had been staring at people, not sleeping, and acting different.

79.     Defendant Molina also documented that he was concerned enough about the change in Mr. Spivey to raise it to other jailers as well as to an employee at the West Texas Centers.

80.     Also on July 23, 2023, then-Reeves County Jailer Javier Avila likewise sent a memo to Defendant LVN Lozano, Defendant Sergeant Gabaldon, and other jailers that he noticed a change in Mr. Spivey's behavior. He noted that Mr. Spivey had usually been quiet and kept to himself but that recently he was staring at jailers, similar to how he had been acting in July 2022

when he attacked two officers because voices were telling him that jailers were trying to control his mind.

81.    A few days later in July 2023, Mr. Spivey completed a medical request form stating that he had muscle pain. He was seen by a medical doctor (not a psychiatrist with West Texas Centers) who documented his weight on July 27, 2023 as 248 pounds.

82.    On August 15, 2023, Mr. Spivey again reported to Sergeant Gabaldon that he was hearing "bad" voices that commanded him to do "crazy" stuff and that he believed law enforcement officers were trying to control or read his mind through "electromagnetic frequencies."

83.    In early October 2023, Mr. Spivey put in a medical request that was reviewed by both Defendant Jailer Yvonne ("Bonnie") Valles and LVN Lozano that he no longer wanted to take his psychotropic medications.

84.    At all relevant times, Defendant LVN Lozano was the jail's medical officer. She received medical requests from detainees, maintained the jail's medical files, and was the primary person responsible for ensuring detainees' medications were administered and submitted for refills, among other duties.

85.    Accordingly, Defendant LVN Lozano actually knew Mr. Spivey was diagnosed with schizophrenia and was prescribed medications for that mental illness/disability by the West Texas Centers. She thus knew that Mr. Spivey was a person with a mental illness/disability that was impairing major life activities including cognition, perception, and the normal workings of his brain.

86.    Defendant LVN Lozano responded to the October 2023 medical request by telling Mr. Spivey that his psychotropic medications would no longer be re-ordered at his request.

Defendant LVN Lozano did not notify anyone at West Texas Centers that Mr. Spivey was declining his mental health medications, request an appointment for him to be evaluated, or otherwise take any steps to have him seen by the West Texas Centers. Defendant LVN Lozano failed to take these actions for Mr. Spivey despite personally knowing he needed all three steps to be taken right away to prevent serious harm as a direct and sole result of his medical conditions and the resulting limits on his major life functions and activities.

87.    On October 14, 2023, Mr. Spivey submitted a medical request for help for an ingrown and infected toenail. LVN Lozano made a medical appointment for Mr. Spivey in response to this request.

88.    On October 15, 2023, Mr. Spivey submitted a jail grievance because law enforcement was using "remote neural monitoring" on him to alter his brain functioning. He reported that Reeves County jailers were working with the U.S. Government to monitor him this way and that it was "torture." The request was reviewed by Defendants Mariana Arpero, Alba Saenz, Irving Molina, Karla Munoz Zubia, and several Defendants Doe among other jailers.

89.    Though this grievance again put Defendants Mariana Arpero, Alba Saenz, Irving Molina, Karla Munoz Zubia, and several Defendants Doe on notice of what they already knew—Mr. Spivey had a severe mental illness/disability that was impairing major life activities including cognition, perception, and the normal workings of his brain and was experiencing suffering as a result—none of them did anything in response. Instead, the grievance was closed without any comment or action taken. No one took any steps to have his mental health evaluated by West Texas Centers.

90.    That same day, October 15, 2023, Mr. Spivey submitted a separate request for medical help because "remote neural monitoring" was being used to "put continuous voices" into

his head, flash images into his head, remotely monitor him, and alter his brain waves. This request for help was reviewed by Defendants Natalie Gabalon and LVN Lozano.

91.    Though this grievance put Defendants Gabaldon and Lozano on notice (again) that Mr. Spivey had severe mental illness that was impairing major life activities including cognition, perception, and the normal workings of his brain—and that he was suffering as a result—neither of them took any action in response to the request. Neither of them contacted the West Texas Centers or took any steps to have him evaluated. Instead LVN Lozano simply thanked Mr. Spivey for the information.

92.    On October 19, 2023, Mr. Spivey saw a doctor only about the ingrown and infected toenail. Again, his weight was documented to be 248 pounds.

93.    On November 2, 2023, Mr. Spivey was seen during a routine appointment by an employee of the West Texas Centers who remained unaware of Mr. Spivey's alarming conduct which reflected his deterioration and noted that Mr. Spivey was experiencing paranoid delusions but could continue to be treated in the jail.

94.    After this appointment, Mr. Spivey's mental and physical health began to rapidly and obviously decline.

95.    On information and belief, throughout the rest of November 2023, Mr. Spivey repeatedly told jailers, including but not limited to Defendants Sergeant Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, and Defendant Does that he was hearing voices and that his mind was being controlled through "remove neural monitoring."

96.    Throughout November 2023, Defendants Sergeant Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Veronica

Martinez, Irving Molina, and Defendant Does each personally offered Mr. Spivey several meals which he refused.

97.    On information and belief, each of these jailers knew that the reason Mr. Spivey was refusing food was because he was paranoid that the food was poisoned and the jailers were putting something in his food. Indeed, he told each of them this is why he was refusing.

98.    By the end of November 2023, Mr. Spivey had lost a significant and obvious amount of weight. On information and belief, Defendants Sergeant Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, and Defendant Does each personally noticed this significant weight loss and recognized that the extreme weight loss over the course of only a month was due to Mr. Spivey's not eating due to his mental illness and paranoia.

99.    Though Defendants Sergeant Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, and Defendant Does each actually knew and recognized that Mr. Spivey's extreme symptoms and manifestations of his mental illness (i.e. not eating) were dangerous and posed a serious risk to Mr. Spivey and his health, none of them reported the weight loss or his not eating due to his paranoia to the West Texas Centers or took any steps to have him seen by the West Texas Centers.

100.    Accordingly, no one at the West Texas Centers was contacted about Mr. Spivey's ongoing starvation and no one at the West Texas Centers evaluated Mr. Spivey for inpatient, involuntary psychiatric treatment, though this was the only means by which Mr. Spivey could be involuntarily medicated for his mental illness and to address the dangers posed to his physical health by his mental illness.

101.    Mr. Spivey continued to refuse all medications and essentially all food provided by the jail during December 2023 because of his paranoia, a symptom of his known and obvious mental illness/disability.

102.    In December 2023, Defendants Mariana Arpero, Xavier Martinez, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Dylan Martinez, Justice Purcel, James Thomas, Bonnie Valles, Alba Saenz, and Defendant Does each personally offered Mr. Spivey several meals, each of which he declined.

103.    Each time he declined a meal tray, he told these Defendant jailers that the reason he was doing so was because he believed they were trying to poison him and would continue to try to control him by putting things in his food.

104.    Accordingly, in December 2023, Defendants Mariana Arpero, Xavier Martinez, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Dylan Martinez, Justice Purcel, James Thomas, Bonnie Valles, Alba Saenz, and Defendant Does were each again put on notice by these conversations that Mr. Spivey had a serious mental illness that was leading him to decline all food.

105.    Though Defendants Mariana Arpero, Xavier Martinez, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Dylan Martinez, Justice Purcel, James Thomas, Bonnie Valles, Alba Saenz, and Defendant Does, as well as—based on the size of the jail which allowed him to personally see Mr. Spivey and based on the reports of his subordinates, the individual Defendants, about his refusing food and other conduct—Sheriff Arturo Granado, each actually knew and recognized that Mr. Spivey's extreme symptoms and manifestations of his mental illness (i.e. declining to eat for weeks and months) were dangerous and posed a serious risk to Mr. Spivey, none of them reported the weight loss or his not eating due

to his paranoia to the West Texas Centers or take any steps to have him seen by the West Texas Centers.

106.    Instead, on December 26, 2023, two months after Mr. Spivey stopped eating and had lost an alarming and obvious amount of weight, the jailers finally started tracking each time Mr. Spivey declined meal trays.

107.    On December 28, 2023, LVN Lozano saw Mr. Spivey in person and weighed him. She documented that he weighed 201 pounds—a 47-pound weight loss due to not eating for two months.

108.    Though LVN Lozano was told on December 28, 2023 by Mr. Spivey as well as jailers that Mr. Spivey had not been eating for months because of his paranoia that Reeves County jailers were poisoning his food and using it for mind control, LVN Lozano did not contact the West Texas Centers, though doing so was obviously necessary and the only available accommodation for his disability as only the West Texas Centers could have him involuntarily hospitalized in a psychiatric hospital funded and administered by HHSC.

109.    Accordingly, no one who had the authority or power to assess Mr. Spivey's mental illness and order that he be committed to an inpatient psychiatric mental health faculty for involuntary treatment was notified of his obvious and dangerous mental and physical deterioration.

110.    Mr. Spivey continued to decline all meals, with the jailers continuing to document that Mr. Spivey refused all food and accepted only water, tea, or juice every day between December 27, 2023 and January 17, 2024.

111.    On January 1, 2024, Mr. Spivey submitted a medical request for help, documenting that he could not retain water and could not eat. This request was reviewed by Defendant Mariana Arpero and Defendant LVN Lozano.

112.    On January 4, 2024, Mr. Spivey was seen by a medical doctor (not a West Texas Centers psychiatrist). The doctor was not told by LVN Lozano or any other person that Mr. Spivey had been refusing food for months.

113.    At that appointment, the doctor noted that Mr. Spivey's weight had dropped further to 188 pounds, 13 pounds less than just a week before. This brought Mr. Spivey's total weight loss to 60 pounds in just over two months as a result of refusing food.

114.    Because he was not told that Mr. Spivey had been refusing food for months because he believed it was poisoned, the doctor documented the weight loss as "unexplained."  The medical doctor ordered lab work which was drawn on January 8, 2024.

115.    On January 8, 2024, Defendant LVN Lozano documented that Mr. Spivey's weight had dropped to 181. This weight was 7 pounds less than just four days before and brought Mr. Spivey's total weight loss to 67 pounds as a result of his not eating because of his mental illness.

116.    During this appointment. Mr. Spivey told Defendant LVN Lozano directly that he was refusing to eat or drink the Pedialyte she tried to give him because it was poisoned.

117.    Defendant LVN Lozano actually knew that Mr. Spivey was not eating and had not been eating for weeks to months because of his paranoia (a manifestation of his mental illness) and that this not eating was a significant factor (if not the only factor) for his alarming weight loss, yet she did not contact the West Texas Centers for an assessment or even tell the medical doctor.

118.    When the medical doctor later received the results of Mr. Spivey's January 8th labs, most of which were alarmingly outside of normal range, he ordered additional labwork and a CT of Mr. Spivey's abdomen.

119.    On January 11, 2024, Defendant LVN Lozano offered Mr. Spivey a "waiver of treatment form" where she documented that Mr. Spivey was refusing the additional labwork and CT because he was too paranoid to allow anything other than water into his body.

120.    Though it was obvious and Defendant LVN Lozano actually knew that Mr. Spivey's mental health had deteriorated to the point that he was not able to understand the risks to himself if he refused this medical care, Defendant LVN Lozano did not notify the doctor of Mr. Spivey's refusal or the reasons for it and did not contact anyone at West Texas Centers to do a mental health assessment on Mr. Spivey.

121.    On January 12, 2024, Mr. Spivey was unable to focus his eyes and reported double vision.

122.    On information and belief, Mr. Spivey's inability to focus his eyes on January 12, 2024 was a manifestation of his developing Wernicke encephalopathy, a life-threatening neurological condition caused by a severe thiamine deficiency that resulted from Mr. Spivey's mental illness driven starvation.

123.    Though Defendant LVN Lozano sent Mr. Spivey to the emergency room on January 12, 2024, on information and belief, neither she nor any other jailer communicated to the emergency room staff why Mr. Spivey was sent to the hospital.

124.    Defendant LVN Lozano did not communicate to the emergency room staff that Mr. Spivey was experiencing problems with his vision or that he had lost 67 pounds and he had not eaten in months.

125.    Because the emergency room staff were not told that Mr. Spivey had not eaten in months, they apparently accepted at face value Mr. Spivey's vague references to being unable to have a bowel movement, diagnosed him with constipation, and discharged him back to the jail.

126.    Between January 12, 2024 and January 17, 2024, Mr. Spivey continued to refuse all food offered by the Defendant jailers and accepted only water. He continued to explain his refusal or inability to eat by referring to his obviously delusional belief that the jail was poisoning his food and trying to use it to control his mind.

127.    No one—not Defendant LVN Lozano or any other Defendant—took any steps to contact the West Texas Centers to ask for a mental health assessment of Mr. Spivey during that time.

128.    On January 17, 2024, Mr. Spivey complained of nausea and vomiting. Defendant LVN Lozano documented that he was unable to stand, unable to see, and confused. She found that his pupils were non-reactive to light or movement and called for an ambulance.

129.    This time, hospital staff were informed that Mr. Spivey had not eaten in at least three weeks but possibly for months, that his mental status was altered, he had vomited, and he had lost vision.

130.    Reeves County Hospital staff contacted the West Texas Centers on January 19, 2024 to notify them of Mr. Spivey's condition. This was the first time the West Texas Centers had been notified of Mr. Spivey's significant and obvious deterioration since they last saw him during the first week of November 2023 when he weighed at least 60 lbs more

131.    On January 19, 2024, West Texas Centers noted that Mr. Spivey had lost all ability to speak and could not open his eyes.

132.    Mr. Spivey was initially admitted to the Reeves County Hospital for three days before he was life-flighted to Hendrick Medical Center in Abilene and admitted to the Intensive Care Unit on January 21, 2024.

133.    At Hendrick Medical Center, doctors determined that, as a result of Mr. Spivey's months' long paranoia-induced starvation, he had suffered from Wernicke encephalopathy with long-term brain damage.

134.    He was hospitalized at Hendrick Medical Center from January 21, 2024 through March 3, 2024 and spent most of those days in the Intensive Care Unit.

135.    When he was discharged on March 3, 2024, he was discharged into Plaintiff's and his father's care. When he was discharged, doctors documented deficits in his cognition and memory and noted that he was unable to climb stairs, bathe, dress himself, or otherwise care for himself on his own.

136.    At all relevant times, Sheriff Arturo Granado was the jail's policymaker for Reeves County. He personally reviewed and approved the jail's policies and procedures and reviewed, approved, and implemented the training program for jailers and the medical officer at the Reeves County Jail.

137.    As the jail's policymaker, Sheriff Arturo Granado was personally involved in and approved the final decision to contract with West Texas Centers to provide mental health care at the Reeves County Jail. As the policymaker of the Reeves County Jail, he personally knew that the West Texas Centers did not operate out of his jail and instead traveled to his jail to see detainees with mental illness only if a regular appointment was scheduled or if his jailers or medical officers contacted the West Texas Centers to notify them of the need for a crisis evaluation.

138.    It is known and obvious that jails in Texas, including the Reeves County Jail, confine pretrial detainees with serious mental illness who would experience mental health crises. Indeed, Sheriff Granado personally knew this to be the case from his involvement with contracting for West Texas Centers to provide mental health services in his jail, his personal experience as a

jailer in the Reeves County jail early in his law enforcement career, his continued oversight of the jail as the Sheriff, and because state regulations informed him that his jail would confine detainees with serious mental illness who would or could experience a mental health crisis that would endanger their health.

139.    At all relevant times when Mr. Spivey was in the jail, Reeves County Jail provided no training to its jailers or medical officer, including the individual Defendants and Doe Defendants discussed herein, regarding what to do if a detainee begins declining meals, even if the detainee's failure to eat was due to paranoia or another obvious symptom of a mental illness or a disability.

140.    Specifically, at all relevant times when Mr. Spivey was in the Reeves County Jail, Reeves County and Sheriff Granado intentionally and deliberately chose to provide no training whatsoever to the jailers or the medical officer what they should do if a detainee with mental illness declined meals.

141.    Reeves County and Sheriff Granado intentionally and deliberately chose not to train jailers or medical officers that they should notify the West Texas Centers or take any other steps necessary to obtain a mental health evaluation for a detainee who was declining to eat as a result of their known and obvious mental illness/disability.

142.    Likewise, at all relevant times when Mr. Spivey was in the Reeves County Jail, Reeves County and Sheriff Granado intentionally and deliberately chose to provide no training whatsoever to the jailers or the medical officer that they should notify the West Texas Centers or take any other steps necessary to obtain a mental health evaluation for a detainee who lost a significant and noticeable amount of weight in a short period of time (i.e. within a few weeks or a

month) while the detainee was also declining to eat as a result of their known and obvious mental illness/disability.

143.    Reeves County and Sheriff Granado reviewed, approved, and adopted these policies, practices, and lack-of-training programs despite knowing that they would endanger detainees with mental illness, would discriminate against detainees with serious mental illness, and would lead to injury and denial of care to detainees with serious mental illness.

144.    Accordingly, though Sheriff Granado as well as Defendants Sergeant Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Justice Purcell, Bonnie Valles, Alba Saenz, LVN Shonah Lozano, and the Defendant Does all each individually recognized and knew that Mr. Spivey had a serious mental illness, were told and knew that he was declining to eat because of the paranoia caused by his mental illness, personally saw and recognized that Mr. Spivey had lost an alarming amount of weight in only a few weeks, and actually drew the inference that Mr. Spivey's health was in danger as a result, each of them followed the County's and Sheriff Granado's policies and practices, including their lack-of-training, and did not contact the West Texas Centers or take any steps towards getting Mr. Spivey the mental health evaluation and involuntary inpatient treatment that he obviously needed.

145.    Furthermore, Mr. Spivey was only subjected to the jail Defendants' deliberate indifference because Defendant Young enacted a statewide policy of under-provisioning necessary inpatient psychiatric care, particularly competency restoration services for pretrial detainees like Mr. Spivey. HHSC and Young knew that thousands of incompetency detainees like Mr. Spivey would languish in jails across the state, suffer psychiatric destabilization, suffer serious medical

harms including death, remained confined in jails far longer than non-disabled criminal defendants, and experience harm to the defense of their criminal cases not inflicted upon non-disabled detainees, and presided over the inadequate system for years while such destabilizations, injuries, discriminatory confinement, and deaths were reported to them. HHSC and Young actually drew the inference that those incompetency detainees, including Mr. Spivey, left on the waitlist longer than reasonably necessary to provide them with competency restoration services would be at a substantial risk of serious harm, including death and permanent injury. Despite recognizing this, neither HHSC nor Young took any steps to ameliorate that risk of harm for years, including through the time of Mr. Spivey's Wernicke encephalopathy.

146.    HHSC and Young further actually drew the inference that the delay from the waitlist would deny competency detainees like Mr. Spivey access to the State criminal justice system, as they had their criminal proceedings delayed for far longer than necessary to accommodate their mental disabilities and restore their competency.

147.    Mr. Spivey's Wernicke encephalopathy, resulting complications, and continuing deficits were proximately caused by the Defendants' intentional disregard and refusal to accommodate Mr. Spivey's known and obvious mental illness and their intentional refusal or failure to obtain obviously necessary mental health care despite actually recognizing it was necessary.

148.    Wernicke's encephalopathy was entirely preventable and its symptoms reversible in its very early stages.

149.    As Mr. Spivey's Wernicke encephalopathy was the result of the Defendants' deliberate indifference to his serious medical needs and disability discrimination, Mr. Spivey's

injuries were entirely preventable if the Defendants had simply accommodated his disability and not failed or refused to obtain the mental health care he obviously needed.

150.    Likewise, Mr. Spivey's injuries were entirely preventable if Reeves County and Sheriff Granado had simply trained its jailers and medical officers on what to do if a detainee with a serious mental illness declined to eat meals for several days, especially if that detainee rapidly lost a noticeable amount of weight and was declining food because his paranoia or other mental illness-related symptom prevented him from eating.

151.    Likewise, Mr. Spivey's injuries were preventable if HHSC and Young had not implemented under-provisioning of state inpatient competency restoration services statewide, leading to Mr. Spivey remaining in jail on the waitlist while decompensating, rather than more likely than not being restored by November 2023 had HHSC and Young provided sufficient inpatient psychiatric care to timely meet the needs of competency detainees.

## IV.    CAUSES OF ACTION

**A.    Americans with Disabilities Act and Rehabilitation Act of 1973 as to Reeves County (Against Defendant Reeves County Only)**

152.    Plaintiff incorporates the foregoing as if fully restated herein and further states that Reeves County is a recipient of federal funds to run, albeit in a patently dangerous fashion, the Reeves County Jail.

1. ***Crisis mental health evaluations and services are necessary and reasonable accommodations that people with serious mental illness require in the Reeves County Jail.***

153.    Title II of the ADA and the Rehab Act require public entitles like Reeves County to reasonably accommodate people with disabilities including people with serious mental illness in all of their programs and services to which people with disabilities are otherwise qualified.

These accommodations ensure that detainees with disabilities including those with serious mental illness have equal access to and can obtain the same benefit from the jail's programs and services.

154.    Schizophrenia and similar serious mental illnesses are disabilities under the ADA and Rehab Act.

155.    Jail meals, housing, recreation programs, vocational programs, showers, and even detention so that a person can be brought to court are programs, services, and activities offered by Reeves County to all detainees at the Jail for purposes of the ADA and Rehab Act.

156.    Detainees with schizophrenia and other serious mental illnesses require mental health care in order to be able to access these services and obtain the same benefit from them enjoyed by non-disabled detainees in the Jail.

157.    Accordingly, mental health care is a reasonable accommodation that Reeves County is obligated to provide to detainees with schizophrenia and other serious mental illnesses.

158.    Likewise, detainees with schizophrenia and other serious mental illnesses who experience mental health crises that put their health at risk—e.g. those who become suicidal or decline meals for weeks at a time and lose an alarming amount of weight in a short period of time—require crisis mental health evaluations and care in order for them to receive the care or involuntary care that will enable them to access the jail's meals, housing, recreation programs, vocational programs, showers, and other programs, services, and activities at the jail and to obtain the same benefit from them enjoyed by non-disabled detainees in the jail.

159.    Accordingly, crisis mental health evaluations and care are reasonable accommodations that Reeves County is obligated to provide to detainees with schizophrenia and other serious mental illnesses who experience mental health crises that put their health at risk in the Reeves County Jail.

160.    Without crisis mental health evaluations and care, detainees with schizophrenia and other serious mental illness who experience mental health crises that put their health at risk continue to deteriorate physically and mentally and quickly become unable to participate in or benefit from the services and programs offered by the jail.

161.    When there are policies, practices, and training programs in place that serve to deny or limit detainees with schizophrenia and other serious mental illnesses access to the jail's programs, services, and benefits, Reeves County likewise has an obligation under Title II of the ADA and the Rehab Act to make reasonable accommodations to these policies, practices, and training programs when necessary to ensure that detainees with serious mental illnesses— especially those experiencing mental health crisis, like Mr. Spivey—have the same access to the jail's services and programs.

162.    Training jailers and the jail medical staff to notify the West Texas Centers to seek crisis mental health services when a detainee who is known to have serious mental illness stops eating and loses an alarming and noticeable amount of weight in only a few weeks is a reasonable, necessary, and obvious accommodation under the ADA and Rehab Act.

163.    Likewise training jailers and jail medical staff to notify the West Texas Centers to seek crisis mental health services when a detainee who is known to have serious mental illness stops eating and tells jailers they are doing so because of their mental illness (i.e. the detainee tells jailers he is not eating because he believes jailers are attempting to control his mind and poison his food) is a reasonable, necessary, and obvious accommodation under the ADA and Rehab Act.

       *2.*  ***Mr. Spivey was a qualified individual with a disability whose need for reasonable accommodations was open, obvious, and apparent.***

164.    Mr. Spivey had schizophrenia and, as a result, experienced auditory and visual hallucinations, heard voices commanding him to do things, and experienced paranoia, including

believing that law enforcement officers were attempting to control his brain and poison him through his food.

165.    Mr. Spivey's mental illness substantially limited his cognition, thinking, and perception as well as the normal functioning of his brain. As his mental illness symptoms manifested more severely, his mental illness affected his ability to eat food, care for himself, communicate, and make medical decisions on his own behalf.

166.    As a detainee in the Reeves County Jail with mental impairments that substantially limited his daily life activities, Mr. Spivey was a qualified individual with a disability within the meaning of the ADA and Rehab Act.

167.    Mr. Spivey repeatedly informed Reeves County Jail staff, including but not limited to the individual jail Defendants and Defendant Does, that he had schizophrenia or another mental illness and, indeed, they knew this to be the case from his CCQ match.

168.    As Mr. Spivey's schizophrenia symptoms worsened, his mental illness and need for accommodations became even more obvious, with Mr. Spivey repeatedly telling Reeves County Jail's staff, including but not limited to the individual jail Defendants and Defendant Does, that his mind was being controlled by "remote neural monitoring," that law enforcement was out to get him, that law enforcement officers were trying to hurt him, that his food was poisoned, and that he could not eat because his food was poisoned.

169.    Reeves County Jail's staff, including but not limited to the individual jail Defendants and Defendant Does, saw and were aware that Mr. Spivey's mental illness was substantially impairing his thinking and perception, that his mental illness was the reason he was declining to eat food and rapidly losing weight, and that his health was in danger as a result.

   3.  ***Reeves County excluded Mr. Spivey from participation in and denied him the benefits of the jail's services, programs, and activities by denying him reasonable and necessary accommodations.***

170.    As a detainee in the Reeves County Jail, Mr. Spivey was "qualified" to access the jail's programs and services.

171.    Mr. Spivey was entitled to reasonable accommodations including mental health care at the Reeves County Jail so that he could access the jail's programs and services including but not limited to its meals, general housing, recreation programs, vocational programs, detention to be brought to court.

172.    As his mental illness disability worsened, Mr. Spivey was entitled to the reasonable, necessary, and obvious accommodations of a crisis mental health evaluation and care in order to access the jail's programs and services, including in particular, its meals.

173.    Mr. Spivey was also entitled to have Reeves County make other reasonable accommodations to its policies, practices, and training programs like its decision not to train its jailers and staff what to do if a detainee with serious mental illness stopped eating, including failing to train its jailers and staff to contact the West Texas Centers to seek crisis mental health services.

174.    Instead of providing Mr. Spivey the reasonable, obvious, and necessary accommodations his serious mental illness required in November and December 2023, Reeves County Jail's staff, including but not limited to the individual jail Defendants and Defendant Does, deliberately and intentionally failed to provide the accommodations.

175.    As a result of their failure and refusal to provide reasonable accommodations, Mr. Spivey suffered more pain and punishment than non-disabled detainees. Because of these failures of Reeves County staff, including but not limited to the individual jail Defendants and Defendant

Does, Mr. Spivey experienced intolerable pain, suffered Wernicke encephalopathy and related complications, nearly died, and is now permanently cognitively impaired.

176.    Reeves County and its jailers and staff should have reasonably accommodated Mr. Spivey by:

**a.** Contacting the West Texas Centers or otherwise obtained a crisis mental health evaluation and services when Mr. Spivey stopped eating;

**b.** Contacting the West Texas Centers or otherwise obtained a crisis mental health evaluation and services when Mr. Spivey stopped eating and expressed the obviously paranoid belief that his food was poisoned;

**c.** Contacting the West Texas Centers or otherwise obtained a crisis mental health evaluation and services when Mr. Spivey stopped eating and lost an alarming amount of weight in only a few weeks;

**d.** Training jailers to watch for and report to the West Texas Centers or other emergency mental health services provider when a detainee with schizophrenia or other serious mental illness stopped eating;

**e.** Training jailers to watch for and report to the West Texas Centers or other emergency mental health services provider when a detainee with schizophrenia or other serious mental illness stopped eating and expressed the obviously paranoid believe that his food was poisoned;

**f.** Training jailers to watch for and report to the West Texas Centers or other emergency mental health services provider when a detainee with schizophrenia or other serious mental illness stopped eating and lost an alarming amount of weight in only a few weeks;

177.    Yet Reeves County deliberately failed or refused to make any of these reasonable modifications to the jail's policies, practices, or training despite knowing that Mr. Spivey had a serious mental illness and that he needed mental health care and crisis mental health services in order to access the jail's services, programs, and benefits.

178.    Reeves County's failures and the failures of its staff, including but not limited to the individual jail Defendants and Defendant Does, to make reasonable accommodations was

intentional and illegal discrimination under the ADA and Rehab Act, entitling Plaintiff to compensatory relief.

179.    In addition, Reeves County's staff intentionally discriminated against Mr. Spivey due to malice and disdain for his disability and the manifestations of his disabilities. Reeves County staff intended to inflict more pain and injury on Mr. Spivey because of his disabilities and the manifestations of his disabilities.

180.    As a direct and proximate result of the conduct of Reeves County Jail's staff, including but not limited to the individual jail Defendants and Defendant Does, Mr. Spivey was injured and suffered damages.

181.    On information and belief, Reeves County Jail accepts federal funding for the programs, divisions, and personnel at issue in this lawsuit.

**B.    42 U.S.C. § 1983 – Fourteenth Amendment – Deliberate Indifference to Medical Care and Unconstitutional Conditions of Confinement (Plaintiff's *Monell* Claims Against Reeves County Only)**

182.    Plaintiff incorporates the foregoing for all purposes as if fully restated herein and further states:

183.    Defendant Reeves County adopted dangerous conditions in the Reeves County Jail that proximately caused injuries to Mr. Spivey and the violation of his rights under the Fourteenth Amendment.

184.    Moreover, the actions of Reeves County's employees described herein constituted medical care so deficient and a denial of access so egregious that it amounted to deliberate indifference to Mr. Spivey's serious medical needs in violation of the Fourteenth Amendment.

185.    At all material times, Reeves County's employees whose actions and inactions are described herein acted under color of state law, as agents of Reeves County.

186.    At all material times, Reeves County's employees whose actions and inactions are described herein were acting within the scope of their duties and pursuant to Reeves County's policies, practices, and lack-of-training at the time they denied Mr. Spivey mental health care and crisis mental health services that he obviously needed.

187.    Defendant Reeves County's policymaker for all matters related to the jail was and still is Sheriff Art Granado.

188.    At the time of the incident, Reeves County had the following policies and practices forming conditions of confinement at the jail—all of which were known to Sheriff Granado, which were adopted with deliberate indifference to the well-being and constitutional rights of its detainees, and which were the moving force of Mr. Spivey's injuries and the constitutional injuries he suffered:

    a.    Denying adequate mental health care to detainees with serious mental illness;

    b.    Delaying access to mental health care by detainees with serious mental illness;

    c.    Failing to train jailers concerning taking care of detainees whose mental illness impaired their ability to take care of themselves, including their basic duty of care for such detainees;

    d.    Failing to train jailers concerning what to do if a detainee with serious mental illness declined meals;

    e.    Failing to train jailers concerning what to do if a detainee with serious mental illness declined meals because they believed the food was poisoned or they otherwise should not eat it as a result of their mental illness;

    f.    Failing to train jailers concerning what to do if a detainee with serious mental illness declined meals and rapidly lost a noticeable and alarming amount of weight within a short period of time (e.g., within mere weeks);

    g.    Failing to train jailers to notify the West Texas Centers or otherwise obtain crisis mental health services for detainees with serious mental illness who stopped eating;

h.   Failing to train jailers to notify the West Texas Centers or otherwise obtain crisis mental health services for detainees with serious mental illness who declined meals because they believed the food was poisoned or they otherwise should not eat it because of their mental illness; and

i.   Failing to train jailers to notify the West Texas Centers or otherwise obtain crisis mental health services for detainees with serious mental illness who declined meals and lost a noticeable and alarming amount of weight within a short period of time (e.g. within mere weeks).

189.   These conditions were sufficiently well known and pervasive to constitute policymaker Sheriff Granado's intended conditions of confinement, policies, and practices at the Reeves County Jail.

190.   These practices and conditions had no legitimate penological purpose, were adopted with deliberate indifference to the health and safety of Reeves County inmates, and were actually known, constructively known, and/or ratified by Reeves County and its policymaker, Sheriff Art Granado.

191.   Moreover, the known and obvious consequence of these conditions, policies, and practices was that Reeves County jail staff and contractors would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

192.   These conditions of confinement were the result of deliberate choices made by the County's policymaker, Sheriff Art Granado, despite the obvious danger to detainees with serious mental illness confined in the jail. Sheriff Granado knew of these dangerous policies and conditions of confinement but failed to protect detainees from them.

193.    The jail's lack of a system and lack of training to ensure detainees with serious mental illness received crisis mental health evaluations and services was known by Sheriff Granado to be wholly inadequate to treat inmates with serious psychiatric conditions.

194.    The County's deliberate indifference to the serious mental health needs its detainees in the jail who experienced mental health crises, like Mr. Spivey, caused him to needlessly suffer and incur permanent injuries.

195.    Moreover, each of these conditions, policies, and practices, as well as the specific actions of the individual jail Defendants, were known to the Sheriff and approved or ratified, either tacitly or directly, by the Sheriff.

196.    Despite these known and obvious problems, Sheriff Granado, as the relevant Reeves County policymaker, did nothing to protect the rights of detainees with serious mental illness in the jail who suffered mental health crises or to remedy the dangerous conditions.

197.    Consequently, the policies, conduct, and conditions delineated above were a moving force of Mr. Spivey's constitutional deprivations and injuries.

198.    As a direct result and proximate cause of the policies, conduct, and conditions described above, Mr. Spivey suffered pain and permanent impairment due to the deprivations of his Fourteenth Amendment rights.

199.    Furthermore, Sheriff Granado was personally aware of Mr. Spivey's presence in the jail, his mental illness, his disability, and—based on the size of the jail which allowed him to personally see Mr. Spivey and based on the reports of his subordinates, the individual Defendants, about his refusing food and other conduct—Mr. Spivey's resulting deterioration, weight loss, starvation, and need for immediate medical and mental health care. As a direct and proximate result of Sheriff Granado's conduct as the final policymaker to nonetheless fail to provide medical

care and nutrition to Mr. Spivey, Mr. Spivey suffered pain and permanent impairment due to the deprivations of his Fourteenth Amendment rights.

**C.    42 U.S.C. § 1983 – Fourteenth Amendment Denial of Medical Care and Nutrition (As to the individual jail Defendants and Doe Defendants)**

200.    Plaintiff incorporates all of the foregoing for all purposes as if fully restated herein and further allege as follows:

201.    Plaintiff brings suit against the individual jail Defendants and Doe Defendants, pursuant to 42 U.S.C. § 1983, for violating Mr. Spivey's Fourteenth Amendment right to receive mental health care and adequate nutrition as a pretrial detainee.

202.    Defendants Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Justice Purcel, Bonnie Valles, Alba Saenz, LVN Shonah Lozano, and Does 1–30, (jail Defendants) while acting under color of law, subjectively knew that Mr. Spivey was suffering an objectively serious mental illness and experiencing obvious symptoms including paranoia that prevented him from eating or consuming adequate nutrition.

203.    Each of the Individual Jail Defendants objectively knew and recognized that that Mr. Spivey's paranoia and inability to eat were symptoms of his serious mental illness.

204.    Each of the Individual Defendants actually saw that Mr. Spivey lost an alarming and noticeable amount of weight swiftly (ultimately 67 pounds over a mere two months) and personally recognized that this weight loss was a result of his inability to eat as a symptom of his severe mental illness.

205.    Each Individual Jail Defendant knew and actually drew the inference that Mr. Spivey's health was endangered by his inability or failure to eat for weeks and months.

206.    Despite their actual, subjective knowledge of the danger to Mr. Spivey's health, each Jail Defendant delayed or intentionally failed or refused to contact West Texas Centers or otherwise arrange for Mr. Spivey to receive crisis mental health services.

207.    By failing or refusing to contact West Texas Centers or otherwise arrange for Mr. Spivey to receive the crisis mental health services they actually knew he imminently needed, Defendants Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Justice Purcel, Bonnie Valles, Alba Saenz, LVN Shonah Lozano, and Does 1–30 were each deliberately indifferent to their duties under the Constitution and deprived Mr. Spivey of his right to treatment of his serious mental health needs and to adequate nutrition.

208.    As a direct and proximate consequence of the Jail Defendants' deliberate indifference, Mr. Spivey suffered pain, permanent injuries, and permanent impairment.

**D.    Americans with Disabilities Act and Rehabilitation Act of 1973 as to HHSC (Against Defendant Texas Health and Human Services Commission Only)**

209.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

210.    Texas Health and Human Services Commission was, at all relevant times, a State agency and recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental disabilities in their facilities, programs, activities, and services and reasonably modify such facilities, services, and programs to accomplish this purpose. 29 U.S.C. § 794.

211.    At all relevant times, HHSC received federal funds for general purposes as well as specifically for the construction and operation of state psychiatric hospitals and the provision of crisis mental health services.

212.    Likewise, Title II of the Americans with Disabilities Act (as amended in 2008) also applies to HHSC and also requires HHSC to make reasonable modifications of its services and programs, including the provision of competency restoration services, to accommodate people with disabilities. 42 U.S.C. § 12131 et seq.

213.    In Texas, criminal cases are brought on behalf of the State of Texas against criminal defendants like Mr. Spivey.

214.    The State of Texas is obligated to provide reasonable accommodations to criminal defendants whose disabilities like mental illness, intellectual disability, and other cognitive impairments prevent them from standing trial by providing competency restoration services to them.

215.    These competency restoration services are provided by and through Texas HHSC and constitute a program and service for Rehabilitation Act and ADA purposes.

216.    Mr. Spivey was a qualified individual for the State's and HHSC's provision of competency restoration services.

217.    HHSC's provision of competency restoration services to incompetency detainees like Mr. Spivey is also necessary for such detainees to access the State's criminal court system.

218.    Mr. Spivey was otherwise qualified for the services and programs of the State's criminal court system.

219.    For the purposes of the ADA and Rehabilitation Act, Mr. Spivey was a qualified individual with one or more disabilities—mental illnesses including schizophrenia—that

substantially limited one or more of his major life activities. Mr. Spivey had one or more mental impairments that substantially limited one or more of his major life activities, or the operation of one or more of his major bodily systems. Specifically, Mr. Spivey's mental illnesses impaired the operation of his brain, and substantially limited his ability to think, eat, sleep, communicate, and care for himself, as described above. *See* 42 U.S.C. § 12102(1)-(2).

220.    Mr. Spivey's mental illnesses likewise prevented him from consulting with his criminal defense lawyer with a reasonable degree of rational understanding and from having a rational and factual understanding of the proceedings brought against him by the State of Texas.

221.    Defendant HHSC knew that Mr. Spivey was a person with a disability. HHSC knew he was incompetent to stand trial due to his mental illness. HHSC knew that Mr. Spivey needed the accommodation of prompt competency restoration treatment to prevent his disability from unduly delaying his criminal process. The State's criminal court had ordered that Mr. Spivey receive this accommodation and this order was referred to and processed by HHSC.

222.    Despite this actual knowledge of Mr. Spivey's disability and need for accommodations, agents of HHSC intentionally discriminated against Mr. Spivey under the meaning of the statutes by purposefully denying him the reasonable accommodation of timely competency restoration services. HHSC never provided this service because it kept Mr. Spivey on the waitlist for months, causing him to decompensate and suffer permanent medical complications resulting from his disability.

223.    Thus, the HHSC failed and refused to reasonably accommodate Mr. Spivey's mental disabilities that it was responsible for providing under state law and under the state criminal court's order, in violation of the ADA and Rehabilitation Act. That intentional failure and refusal proximately caused a delay in his criminal proceedings, prevented his competency from being

restored, as well as causing his decompensation, weight loss, and catastrophic complications including encephalopathy.

224.    As Mr. Spivey suffered and was permanently injured as a direct and proximate result of HHSC's intentional discrimination against him, Plaintiff is entitled to compensatory damages against HHSC.

**E.    42 U.S.C. § 1983 – Fourteenth Amendment – Denial of Due Process**
**(Against Defendant Cecile Erwin Young Only)**

225.    Plaintiff incorporates the previous paragraphs as if alleged herein, and further pleads:

226.    Mr. Spivey had a clearly established Fourteenth Amendment right to due process, including, upon being found incompetent to stand trial, Mr. Spivey had a right to be housed in confinement only so long as that confinement was reasonably related to the restorative purpose for which the State's criminal court had committed him.

227.    Rather than promptly providing competency restoration services to Mr. Spivey, Young's policy caused Mr. Spivey and thousands of other Texas incompetency detainees to be unnecessarily housed in jail for months to years without competency restoration services. Young's policy was to maintain insufficient forensic capacity at HHSC for the needs of IST defendants in the State's criminal court system.

228.    Young knew that incompetency detainees on the waitlist for HHSC's inpatient competency restoration services like Mr. Spivey had to wait nearly two years by May 2023. Young knew that dozens of incompetency detainees had died on HHSC's waitlists, and that many more suffered psychiatric destabilization and other injuries, as a result of the delays caused by HHSC's and Young's policy, and that many more would die or suffer grievous injury based on HHSC's and Young's purposeful delays. Young also knew that incompetency detainees like Mr. Spivey

would suffer these harms as a direct and proximate result of HHSC's policy of refusing to timely admit incompetency detainees to HHSC's inpatient mental health facilities for timely competency restoration services.

229.    Defendant Young acted with deliberate indifference to Mr. Spivey's right to due process, right to access the criminal court system, and his serious health and safety needs, in violation of his rights under the Fourteenth Amendment to the United States Constitution by causing him to be denied timely competency restoration services despite knowing that the result of such denial was that Mr. Spivey and others like him would remain confined in Texas jails that did not provide any competency restoration services and, more likely than not, would suffer serious injury.

230.    Further, Young implemented the practices and policies that she knew would result in refusing timely competency restoration services to incompetency detainees like Mr. Spivey who would suffer those harms as a result of the unnecessary deprivation of their liberty, psychiatric destabilization, and serious medical harm.

231.    Young's actions included presiding for years over the under-provision of psychiatric competency restoration services while hundreds suffered or died, including in state hospitals for detainees like Mr. Spivey who could receive such services only in HHSC's inpatient psychiatric hospitals. Young chose not to expand competency restoration services such as by expanding contracted services at private hospitals, releasing space in state hospitals used for civil patients, authorizing the construction of more state hospitals, and authorizing the funding of more mental health provider staff positions to service forensic patients.

232.    Young knew before May 2023 that these decisions would result in obvious dangers, including by causing the waitlist to continue to grow and causing incompetency detainees to wait

longer and suffer serious harm. Young knew before May 2023 that many incompetency detainees had died from these decisions, and many more had suffered psychiatric destabilization and other complications like Mr. Spivey. Young also knew that may more would suffer injuries in the future.

233.    Young knew that the delays inflicted by HHSC's policies and lack of sufficient capacity for the provision of inpatient competency restoration services lacked any legitimate government purpose.

234.    Young actually drew the inference that her policy decisions would injure and even kill incompetency detainees like Mr. Spivey.

235.    As a direct and proximate result of Young's policy decisions, Mr. Spivey suffered an extended incarceration in jail, psychiatric decompensation, and permanent injuries including encephalopathy.

236.    Accordingly, Young is liable to Plaintiff under 42 U.S.C. § 1983.

## V.    DAMAGES

237.    Plaintiff incorporates all of the foregoing as if fully restated herein and further alleges:

238.    Plaintiff seeks compensatory damages against all Defendants and punitive damages against all Defendants other than Reeves County and HHSC in light of their egregious conduct.

239.    Plaintiff seeks the following damages:

a.    past and future physical pain and mental anguish;

b.    past and future loss of enjoyment of life;

c.    past and future disfigurement;

d.    past and future impairment;

e.    past and future lost wages and lost earning capacity;

f.    past and future medical expenses;

g.      attorneys' fees, expenses (including expert expenses), and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, or as otherwise allowed by law;

h.      pre-judgment and post-judgment interest at the highest rates allowable under the law; and

i.      punitive damages as to Defendants Young, Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Justice Purcel, Bonnie Valles, Alba Saenz, LVN Shonah Lozano, and Does 1–30.

## VI.     ATTORNEYS' FEES AND COSTS

240.     Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover attorneys' fees, costs, and expenses against all Defendants as to the 42 U.S.C. § 1983 claims. Additionally, pursuant to 42 U.S.C. § 12205, Plaintiff is entitled to recover attorneys' fees, costs, and expenses (including expert expenses) against Defendants Reeves County and HHSC as to the ADA and Rehabilitation Act claims.

## VII.     JURY DEMAND

241.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby requests a jury trial.

## VIII.   PRAYER FOR RELIEF

THEREFORE, Plaintiff requests that the Court:

A.      Award compensatory damages against all Defendants, jointly and severally;

B.      Award punitive damages against Defendants Cecile Erwin Young, Natalie Gabaldon, Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Justice Purcel, Bonnie Valles, Alba Saenz, LVN Shonah Lozano, and Does 1–30 only;

C.      Award pre-judgment and post-judgment interest at the highest rate available under the law;

D.      Find that Plaintiff is the prevailing party in this case and award her attorneys' fees, court costs, expert costs, and litigation expenses; and,

E.     Grant such other and further relief, legal and equitable, to which Plaintiff may be entitled.

Dated: October 16, 2025.

Respectfully submitted,

EDWARDS LAW
603 W. 17TH ST.
AUSTIN, TX  78701
Tel.  512-623-7727
Fax.  512-623-7729

By: /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-charge
MIKE SINGLEY
State Bar No. 00794642
mike@edwards-law.com
LISA SNEAD
State Bar No. 24062204
lisa@edwards-law.com
DAVID JAMES
State Bar No. 24092572
PAUL SAMUEL
State Bar No. 24124463
paul@edwards-law.com

ATTORNEYS FOR PLAINTIFF