IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CONNIE LYNN SPIVEY, as Next Friend and attorney-in-fact of ROBERT DANIEL SPIVEY, | § | |
| *Plaintiff*, | § | No. 1:25-CV-01667-DAE |
| v. | § | |
| REEVES COUNTY *et al.* | § | |
| *Defendants*. | § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

Before the Court is (1) Defendant Reeves County, Texas's ("Reeves County") Motion to Dismiss (Dkt. # 66), (2) Defendant Texas Health and Human Services Commission's ("HHSC") and Defendant Cecile Erwin Young's[1] Motion to Dismiss (Dkt. # 63), and (3) the Individual Jailer

[1] At the outset, the Court notes that in July 2026 it issued Findings of Fact and Conclusions of law in a factually similar but unrelated matter. See Ward by his Next Friend v. Muth, No. 1:16-CV-00917, 2026 WL 1974743 (W.D. Tex. July 7, 2026). At this stage, issues of claim and issue preclusion do not factor into the Court's analysis—nor has any party briefed them. The Court is aware the HHSC waitlist policy that Plaintiff's FAC implicates (see Dkt. # 33 at ¶¶ 65–86, 155–56, 161, 232, 238, 242) was determined to be unconstitutional *after* Plaintiff filed and then amended her complaint. See Ward, 2026 WL 1974743, at *39, 45. The prospective equitable relief that the Court awarded to the class in that case, however, differs in kind from the legal relief sought here. Therefore, and for the reasons discussed infra, the Court distinguishes its present conclusion on standing (*i.e.*, that issues of traceability bar Plaintiff's

Defendants'[2] Motion to Dismiss (Dkt. # 65) Ms. Connie Lynn Spivey's (Plaintiff) First Amended Complaint ("FAC") as Next Friend of her son, Mr. Robert Daniel Spivey ("Mr. Spivey") (Dkt. # 33). The Court deems this case suitable for disposition without a hearing. After careful consideration of the filings and relevant case law, the Court **GRANTS** HHSC's and Defendant Young's Motion to Dismiss (Dkt. # 63). It **GRANTS IN PART AND DENIES IN PART** the Individual Jailer Defendants' Motion to Dismiss (Dkt. # 65). And the Court **DENIES** Reeves County's Motion to Dismiss (Dkt. # 66).

## BACKGROUND

This case concerns a pretrial detainee's mental illness and how alleged systemic and individualized failures (among nearly three dozen named individual, municipal, and state Defendants) resulted in the deprivation of rights that the federal Constitution and federal statutes guarantee. By any account, Mr. Spivey's mental and physical decline in Reeves County custody is disturbing. It

---

claim for damages against HHSC and Defendant Young) from its analysis of standing in the prior case.

[2] The "Individual Jailer Defendants" whom Plaintiffs name in their Complaint include Mariana Arpero, Suany Castillo-Solano, Aida Contreras, Ashley Diaz, Eric Dominguez, Natalie Gabaldon, Rebecca Gonzalez, Patricia Hill, Isaiah Jurado, Alejandro Lazcano, Shonah Lozano, Veronica Martinez, Xavier Martinez, Irving Molina, Dylan Montanez, Juan Munoz, Justice Purcell, Miray Rodriguez, Alba Saenz, Idaly Sanchez Molina, Erika Soler, Oscar Solis, Jackson Steiner, James Thomas, Samuel Urias, Yvonne Valles, Estrella Vasquez, Karla Munoz Zubia." (Dkt. # 33 at ¶¶ 5–32.)

is also emblematic of the mental health crises plaguing county jails and prisons here in the State of Texas and across the United States.[3] The Court will recite this case's procedural history, factual claims, and legal allegations in turn.

I. Procedural History

Plaintiff filed her original complaint on October 16, 2025. (Dkt. # 1.) Then, on December 10, 2025, the Cout granted Plaintiff's December 9, 2025, Unopposed Motion for Leave to File Amended Complaint (Dkt. # 31), which made Plaintiff's FAC (Dkt. # 33) the operative complaint.

On December 19, 2025, HHSC and Defendant Young filed their Motion to Dismiss Plaintiff's FAC. (Dkt. # 63). Also on December 19, the Individual Jailer Defendants filed their Motion to Dismiss. (Dkt. # 65.) And lastly, on December 20, 2025, Defendant Reeves County filed its Motion to Dismiss. (Dkt. # 66.) Plaintiffs filed Responses in Opposition to each Defendant's respective Motion. (See Dkts. ## 82 (HHSC and Defendant Young); 84 (Individual Jailer Defendants); 88 (Reeves County).) The

---

[3] See generally Sophia Allen, Access to Health Care in Jail: Perspectives from People Living on the Inside (July 2024) (PhD dissertation, Stanford University) (ProQuest) (chronicling the mental health crisis in jails across the United States and supplying the perspectives of incarcerated populations); J. Elizabeth Hergert, Note, Jails into Asylums: How Harris County Jail Became the Largest Mental Health Facility in Texas and Why People Incompetent to Stand Trial Face Indefinite Detention, 34 B.U. Pub. Int. L.J. 93 (2025) (highlighting how Harris County jail serves as the Texas's largest mental health facility, and discussing problems that attend to penological systems that provide the first line of mental healthcare and psychiatric treatment to vulnerable populations).

Defendants then filed individual Replies. (See Dkts. ## 86 (Individual Jailer Defendants); 90 (Reeves County); 92 (HHSC and Defendant Young).)

II. Factual Allegations

Plaintiff alleges that her son, Mr. Spivey, was booked into Reeves County Jail ("RCJ") after his arrest on or about April 30, 2022. (Dkt. # 33 at ¶ 37.) After detention at other Texas county jails during 2022, Plaintiff alleges that Mr. Spivey returned to RCJ on or about November 7, 2022, and remained there until January 2024. (Id. at ¶ 38.) Defendants' alleged misconduct during the latter timeframe supplies the basis for the First Amended Complaint. (See id. at ¶¶ 37–161.)

Mr. Spivey was reportedly "experiencing symptoms of schizophrenia, including hearing voices" at the time that he was booked into TCJ in late-April 2022, and had been diagnosed as suffering from schizophrenia. (Id. at ¶¶ 37, 40.) Plaintiff also alleges that Defendants had constructive notice of Mr. Spivey's mental health history at the time he was booked and actual notice shortly thereafter. (See id. at ¶¶ 40–42 (alleging that Mr. Spivey "was a positive match on the Continuity of Care Query (CCQ)" that would alert all Texas county jail staff to a pretrial detainee's mental health history); id. at ¶¶ 50–53 (alleging that West Texas Centers, the mental healthcare providers for West Texas jails like RCJ, was contacted to provide an evaluation for Mr. Spivey for his mental health symptoms in June 2022).) And Plaintiff alleges that Mr. Spivey attacked and injured two RCJ jailers in July 2022 during

a Schizophrenia-related episode. (Id. at ¶ 53.) Because of the small size of RCJ, Plaintiff further alleges, "Mr. Spivey's attack on the two jailers as well as the fact that he heard voices commanding him to hurt [RCJ Jailers] was well known." (Id. at ¶¶ 53–56.)

From November 2022 to January 2023, Plaintiff alleges that RCJ officials housed Mr. Spivey in a single cell. (Id. at ¶ 61.) RCJ did this, Plaintiff claims, because it had identified (and West Texas Centers had approved) Mr. Spivey's placement on suicide watch and that "Mr. Spivey . . . reported voices were continuing to tell him to harm others." (Id. at ¶¶ 61–64.) By January 2023, Plaintiff alleges that Mr. Spivey's "mental health [had] marginally improved" such that RCJ "moved [him] back into the general population of the jail." (Id. at ¶ 64.) However, he was deemed incompetent to stand trial several months later in May 2023. (See id. at ¶ 65.) As a consequence of this determination, the FAC contends that Mr. Spivey was "put on a years' long waitlist for competency restoration services" that was governed by the "longstanding policy decisions of HHSC and Defendant Young." (Id. at ¶¶65–66.)[4]

---

[4] Plaintiff alleges that when Mr. Spivey was placed on the waitlist, it had "an average wait time of 710 days." (Id. at ¶ 79.) Additionally, and by dint of their position, Plaintiff alleges that "HHSC and Defendant Young are responsible for providing timely competency restoration services for everyone found incompetent to stand trial by Texas State criminal courts" *and* that "[f]or years, [both] HHSC and Defendant Young have chosen not to provide enough inpatient competency restoration services, leading to an enormous backlog of

Then, on July 23, 2023 (while Mr. Spivey remained on the waitlist for inpatient treatment at a maximum-security state hospital), Plaintiff alleges that "Defendant Officer Irving Molina sent a memo to Defendant L[icensed] V[ocational] N[urse] Lozano, Defendant Sergeant Gabaldon, and other jailers that he noticed abnormal behavior from Mr. Spivey that he attributed to Mr. Spivey's . . . mental illness." (Id. at ¶ 87.) The same day, Defendant Molina allegedly raised the "change" in Mr. Spivey's demeanor to "other jailers as well as . . . an employee at the West Texas Centers." (Id. at ¶ 88.) Also that same day, Plaintiff claims that Defendant Javier Avila also sent a memorandum to Defendant LVN Lozano, Defendant Sergeant Gabaldon, and other jailers that he, too, had observed Mr. Spivey's behavioral changes. (Id. at ¶ 89; see also id. (asserting that Defendant Avila analogized Mr. Spivey's behavior to "how [Mr. Spivey] had been acting in July 2022 when he attacked two officers because voices were telling him that jailers were trying to control his mind).)[5]

Then, Plaintiff claims that Mr. Spivey had reported hearing "bad" voices on August 15, 2023, and specifically told Sergeant Gabaldon that they

---

patients waiting to be admitted as an inpatient at state hospitals or private hospitals with competency restoration programs funded and administered by HHSC." (Id. at ¶¶ 67–68.)

[5] With respect to LVN Lozano, Plaintiff's FAC alleges the following: "At all relevant times, Defendant LVN Lozano was the jail's medical officer. She received medical requests from detainees, maintained the jail's medical files, and was the primary person responsible for ensuring detainees' medications were administered and submitted for refills, among other duties." (Id. at ¶ 93.)

"commanded him to do 'crazy' stuff and that he believed law enforcement officers were trying to control or read his mind through 'electromagnetic frequencies.'" (Id. at ¶ 91.) Sometime in October 2023, Plaintiff next alleges that Mr. Spivey asked LVN Lozano and Defendant Jailer Yvonne ("Bonnie") Valles to stop taking his prescribed psychotropic medications. (See id. at ¶ 92.) LVN Lozano allegedly responded "by telling Mr. Spivey that his psychotropic medications would no longer be re-ordered at his request." (Id. at ¶ 95.) Plaintiff alleges that LVN Lozano neither "notif[ied] anyone at West Texas Centers that Mr. Spivey was declining his mental health medications, request[ed] an appointment for him to be evaluated, [n]or otherwise t[ook] any steps to have him seen by the West Texas Centers." (Id.)

Sometime after Mr. Spivey allegedly made (and LVN Lozano approved) the request to stop taking his medications, Plaintiff claims Mr. Spivey subsequently "submitted a jail grievance because law enforcement was using 'remote neural monitoring' on him to alter his brain functioning" and "[h]e reported that Reeves County jailers were working with the U.S. Government to monitor him this way and that it was 'torture.'" (Id. at ¶ 97.)[6] Plaintiff alleges that Mr. Spivey made a separate request on the same day (October 15, 2023)

[6] Plaintiff alleges that the request was reviewed by Defendants Mariana Arpero, Alba Saenz, Irving Molina, and Karla Munoz Zubia. See id. Plaintiff also claims that, on October 19, when Mr. Spivey saw a doctor for an ingrown and infected toenail, "his weight was documented at 248 pounds." (Id. at ¶ 102.)

again referencing mind control and "remote neural monitoring." (See id. at ¶ 99.) Despite these reports, Plaintiff claims that no Individual Jailer Defendant contacted West Texas Centers—the mental healthcare provider for RCJ—or in any way alerted them to Mr. Spivey's changed mental state. (See id. at ¶¶99–100.)

Then, and a pivotal point in the FAC's narrative arc, Plaintiff alleges that Mr. Spivey's physical and mental health began a precipitous decline after his regularly scheduled mental healthcare appointment with West Texas Centers on November 2, 2023. (See id. at ¶¶ 102–09; see also id. at ¶ 102 (alleging that the West Texas Centers employee "remained unaware" of the aforementioned changes in Mr. Spivey's behavior and recommended that he continue to receive treatment in jail).) Specifically, Plaintiff alleges that Mr. Spivey "refuse[d] all medications and essentially all food provided by [RCJ]" from some point in November 2023 through early-January 2024. (See id. at ¶¶ 105–06, 109–135.) Plaintiff asserts that "Mr. Spivey was refusing food because he was paranoid that the food was poisoned and the jailers were putting something in his food." (Id. at ¶ 106.) And, only on December 26, 2023, Plaintiff alleges, did any of the Individual Jailer Defendants begin recording when Mr. Spivey declined a meal. (See id. at ¶ 115.) By the time Mr. Spivey saw LVN Lozano on December 28, 2023, Plaintiff alleges that "[s]he documented that he weighed 201 pounds," which reflected his "47-pound weight loss due to not eating for two months." (Id. at ¶ 116.)

Then, on January 1, 2024, Plaintiff alleges that Mr. Spivey requested medical attention, stating that "he could not retain water and could not eat." (Id. at ¶ 120.) A medical doctor saw Mr. Spivey on January 4, 2024, however, Plaintiff alleges that "[t]he doctor was not told by LVN Lozano or *any other person* that Mr. Spivey had been refusing food for months." (Id. ¶ 122 (emphasis added).) By January 8, 2024, Plaintiff alleges that, as recorded by LVN Lozano, Mr. Spivey's weight had dropped another 13 pounds from the week prior: he then weighed 188 pounds. (See id. at ¶ 122.) Plaintiff explains this drastic weight loss by alleging that "jailers continu[ed to] document that Mr. Spivey refused all food an accepted only water, tea, or juice every day between December 27, 2023, and January 17, 2024." (Id. at ¶ 119.)

On January 12, 2024, Plaintiff asserts that Mr. Spivey reported to RCJ staff that "[he] was unable to focus his eyes and reported double vision." (Id. at ¶ 130.) This, Plaintiff contends, "was a manifestation of [Mr. Spivey's] developing Wernicke encephalopathy, a life-threatening neurological condition caused by a severe thiamine deficiency that resulted from Mr. Spivey's mental illness driven starvation." (Id. at ¶ 131.) That day, LVN Lozano allegedly "sent Mr. Spivey to the emergency room." (Id. at ¶ 133.) Critically, however, Plaintiff asserts that "LVN Lozano did not communicate to the emergency room staff that Mr. Spivey was experiencing problems with his vision or that he had lost 67 pounds and he had not eaten [any food] in months." (Id.) As a consequence, Plaintiff further alleges, the emergency room staff "apparently

accepted at face value Mr. Spivey's vague references to being unable to have a bowel movement, diagnosed him with constipation, and discharged him back to the jail." (Id. at ¶ 134.)

After returning to RCJ, Plaintiff alleges that Mr. Spivey remained there from January 12, 2024, to January 17, 2024—"accept[ing] only water" and "refus[ing] all food offered by individual Defendant jailers." (Id. at ¶ 135.) Then, on January 17, 2024, Plaintiff alleges that "Mr. Spivey complained of nausea and vomiting" such that "Defendant LVN Lozano documented that he was unable to stand, unable to see, and confused" and that she "called for an ambulance" upon finding "his pupils . . . non-reactive to light or movement." (Id. at ¶ 138.)

Mr. Spivey allegedly went directly from RCJ custody to Reeves County Hospital where he spent "three days before he was life-flighted to Hendrick Medical Center in Abilene and admitted to the Intensive Care Unit on January 21, 2024." (Id. at ¶ 144.) He remained in intensive care for approximately six weeks before being discharged into his father's and Plaintiff's care. (See id. at ¶¶ 144–45.) Since that time, Plaintiff claims that Mr. Spivey has suffered severe physical and intellectual disability as a result of his Wernicke encephalopathy. (See id. at ¶¶ 133, 157–59, 185, 233.) She also alleges that Mr. Spivey's time in RCJ's custody ultimately caused him "long-term brain damage" and left him "unable to climb stairs, bathe, dress himself, or otherwise care for himself on his own." (Id. at ¶¶ 143, 145.)

## III. Legal Allegations

Plaintiff alleges five violations of Mr. Spivey's federal constitutional and statutory rights. She alleges them against different Defendants and combinations thereof. First, she alleges that Reeves County violated the Americans with Disabilities Act and Rehabilitation Act of 1973. (See id. at ¶¶162–91.)[7] Second, she alleges a 42 U.S.C. § 1983 claim against Reeves County. She contends that Mr. Spivey's conditions of confinement at RCJ violated several of Mr. Spivey's Fourteenth Amendment rights. (See id. at ¶¶ 192–209.) Third, Plaintiff brings another § 1983 claim against each of the twenty-eight staff members of RCJ, alleging that they violated Mr. Spivey's right to receive mental health care and adequate nutrition as a pretrial detainee. (See id. at ¶¶ 210–18.) Fourth, she brings an ADA claim against HHSC that alleges it violated Mr. Spivey's statutory rights by instituting a policy or practice that not only failed to accommodate him but also intentionally discriminated against him on grounds of his mental illness. (See id. at ¶¶ 219–34.) And, fifth, Plaintiff brings a § 1983 claim against the HHSC Commissioner, Cecile Erwin

---

[7] Specifically, she outlines claims that "(1) [c]risis mental health evaluations and services are necessary and reasonable accommodations that people with serious mental illness require in the Reeves County Jail"; (2) "Mr. Spivey was a qualified individual with a disability whose need for reasonable accommodations was open, obvious, and apparent"; and (3) "Reeves County excluded Mr. Spivey from participation in and denied him the benefits of the jail's services, programs, and activities by denying him reasonable and necessary accommodations." (Id.)

Young, for violating Mr. Spivey's right to due process as well as his "right to be housed in confinement only so long as that confinement was reasonably related to the restorative purpose for which the State's criminal court had committed him." (See id. at ¶¶ 235–46.)

## LEGAL STANDARD

### I. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for "lack of subject-matter jurisdiction." When evaluating a Rule 12(b)(1) motion, the Court may dismiss a suit "for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Freeman v. United States, 556 F.3d 326, 334 (5th Cir. 2009) (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)). To withstand a motion to dismiss for lack of subject matter jurisdiction, a plaintiff must plead that it: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016); see also id. ("Where . . . a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." (citation modified) (emphasis added)).

II. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." When analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)). The court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (quoting Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss. See Twombly, 550 U.S. at 555–56; cf., e.g., Lowy v. Daniel Def., LLC, 167 F.4th 175, 193 (4th Cir. 2026) ("Plaintiffs are not

required to prove their case in the complaint." (citation modified)). In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action. See Twombly, 550 U.S. at 556–57. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (citation omitted). However, "a motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" Turner v. Pleasant, 663 F.3d 770, 775 (5th Cir. 2011) (quoting Harrington v. State Farm Fire & Cas. Co., 563 F.3d 141, 147 (5th Cir. 2009)). And, when a 12(b)(6) motion is granted, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).

## DISCUSSION

The Court will analyze each Defendant and their respective arguments about the Plaintiffs' Complaint in turn, beginning with Reeves County.

I. Reeves County

A. 42 U.S.C. § (*Monell*) Claim

Section 1983 provides, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. In Monell v. Department of Social Services of the City of New York, the Supreme Court held that a municipality cannot face liability under § 1983 *unless* "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." 436 U.S. 658, 694 (1978). In other words, "[a] plaintiff may not recover against a municipality via theories of respondeat superior—the municipality itself must be responsible for the constitutional violation." Martinez v. Nueces Cnty., 71 F.4th 385, 389 (5th Cir. 2023). The successful plaintiff at the motion to dismiss stage is one who pleads "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force'

is that policy or custom." Id. (quoting Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002) (internal citation omitted)).

"A policy or custom may be attributed to a municipal defendant through the identification of a final policymaking authority." Garza v. City of Donna, 922 F.3d 626, 637 (5th Cir. 2019) (first citing Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407 (1997); and then citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)). "Identification of an official as a final policymaking authority is a question of state and local law." Id. (citing Praprotnik, 485 U.S. at 124).

The Fifth Circuit recently clarified that "[t]o survive a motion to dismiss on . . . Monell claims against a [municipality], [a plaintiff] need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." Thompson v. McGehee, 183 F.4th 353, 372 (5th Cir. 2026). "[M]unicipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval." Zarnow v. City of Wichita Falls, 614 F.3d 161, 166 (5th Cir. 2010). Additionally, "[t]o proceed beyond the pleading stage, a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." Thompson, 183 F.4th at 372 (citation modified).

When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a

condition of confinement or as an episodic act or omission. Garza, 922 F.3d at 632 (citing Hare v. City of Corinth, 74 F.3d 633, 644 (5th Cir. 1996) (en banc)). "Cases of the former are attacks on "general conditions, practices, rules, or restrictions of pretrial confinement." Id. (citation modified). "In cases of the latter, 'the complained-of harm is a particular act or omission of one or more officials,' and 'an actor usually is interposed between the detainee and the municipality.'" Id. (quoting Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)).

Plaintiff brings a Monell claims that sound in both conditions of confinement and episodic act or omission.[8] In its Motion to Dismiss, Reeves County focuses on Plaintiff's condition of confinement claim. (See Dkt. # 66 at 7–9.) Plaintiff argues that Reeves County waived its challenge to the episodic acts and omissions claim. (See Dkt. # 88 at 23–24.) Plaintiff cites authorities that purport to extend the doctrine of a party's waiver (on appeal) of arguments not raised in the district court to arguments not briefed in the district court. See, e.g., Lopez v. River Oaks Imaging & Diagnostic Grp., Inc., 542 F. Supp. 2d 653,

[8] The Court notes the Fifth Circuit's holding in Estate of Henson v. Wichita County that "there is no rule barring a plaintiff from pleading both alternative theories [*i.e.*, episodic act or omission and conditions of confinement]." 795 F.3d 456, 464 (5th Cir. 2015). And it is satisfied that the FAC pleads both theories. (See Dkt. # 33 at ¶¶ 196–209.)

658 n.9 (S.D. Tex. 2008). The Court disagrees.[9] Accordingly, it will analyze the merits of both Plaintiffs' Monell claims against Reeves County.

1. Conditions of Confinement

"If a pretrial detainee challenges 'general conditions, practices, rules, or restrictions of pretrial confinement,'" the Fifth Circuit has held that a court is required to "evaluate whether the condition was 'reasonably related to a legitimate governmental objective.'" Cope v. Cogdill, 3 F.4th 198, 207 n.5 (5th Cir. 2021) (quoting Hare, 74 F.3d at 644–47; and then citing Bell v. Wolfish, 441 U.S. 520, 539 (1979)). Furthermore, "[c]onditions of confinement may be explicit (for example, rules about disciplinary segregation) or they may be de facto (that is, acts that are proven to be a pervasive practice)." Id. (citing Estate of Henson, 795 F.3d at 463. The Fifth Circuit has also deemed conditions not "reasonably related to a legitimate governmental objective" should a court determine them to be "arbitrary or purposeless." Id. (quoting Bell, 441 U.S. at 539. In such cases, "a court permissibly may infer that the purpose of the

[9] Reeves County is generally correct in its characterization of the Fifth Circuit's decision in Sanchez v. Young County. See (Dkt. # 90 at 4 (citing Sanchez, 866 F.3d 274, 279 (5th Cir. 2017)). In Sanchez, the Fifth Circuit ultimately remanded a Monell claim to the district court for the latter to consider a plaintiffs' conditions of confinement theory on their Monell claim. Sanchez, 866 F.3d at 279 Specifically, the Fifth Circuit determined that the district court had not "analyze[d] their unconstitutional conditions of confinement claim at all," which required remand "[i]n deference to the trial court's responsibility to review the record in the first instance." Id.

governmental action is punishment that may not constitutionally be inflicted upon detainees." Id.

Reeves County posits that the conditions of confinement claim must be dismissed because "[t]here is no allegation that other detainees with a serious mental illness have not been provided appropriate medical and mental health care, or that the jail has a history of such problems with other detainees." (Dkt. # 66 at 8.) But this argument misses the forest for the trees. For example, the Fifth Circuit has found allegations pleading a Monell claim against a municipality need not identify "specific examples . . . to meet the condition or practice element." E.g., Montano v. Orange Cnty, 842 F.3d 865, 876 (5th Cir. 2016); Sanchez v. Young Cnty., 956 F.3d 785 794 (5th Cir. 2020) (recognizing that a "de facto policy can be established through consistent testimony" that, for example, "a jail has a practice of leaving intoxicated detainees in a cell until they become coherent"). The district court opinions that Plaintiff identifies in its Response to Reeves County's Motion are similarly persuasive. (See Dkt. # 88 at 16–17.)[10]

[10] See, e.g., Dotson v. Bexar Cnty. Hosp. Dist., No. 19-CV-00083, 2019 WL 6311375, at *5 (W.D. Tex. Nov. 25, 2019) ("Plaintiffs' allegations that Defendants UHS and Yao were responsible for the medical care of pretrial detainees, that they knew Ms. Dotson-Stephens suffered from hypertension and schizoaffective disorder, that over five months and through dozens of personnel members they ignored her symptoms and provided no medical care outside of "monitoring" her, and that as a result Ms. Dotson-Stephens lost 136 pounds in five months and ultimately died of hypertension and schizoaffective disorder, if true, support a viable claim for unconstitutional conditions of confinement.")

Here, too, Plaintiff has sufficiently pleaded a Monell claim for conditions of confinement. She has demonstrated how, as a result of his paranoid schizophrenia-induced delusions, Mr. Spivey believed the food he was given at RCJ was poisoned and rejected meals over a seventy-six-day period. (See Dkt. # 33 at ¶¶ 104–07, 110–13.) Second, her allegation that Reeves County had both actual and constructive notice that Mr. Spivey was rapidly losing weight over the two-month time period and did not, as a matter of course, contact the mental healthcare provider (West Texas Centers) charged with providing psychiatric care to detainees in RCJ further comports with a plausible condition of confinement claim. (See id. at ¶¶ 43–48, 97–98, 104–14, 117–18, 126, 129, 147–52,198); cf. Sanchez, 956 F.3d at 795 (stating that a district court evaluating a conditions of confinement claim need not do so in a vacuum because "confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a 'mutually enforcing effect that produces the deprivation of a single, identifiable human need'" (quoting Wilson v. Seiter, 501 U.S. 294, 304 (1991))).

Plaintiff has also alleged that the conditions of Mr. Spivey's confinement in RCJ "amounted to punishment."[11] Plaintiff is correct in her

---

[11] In pertinent part, the Court reproduces the operative language from Bell v. Wolfish:

> "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination

Response that "to the extent Reeves County . . . suggests that protecting Mr. Spivey's liberty interest in refusing treatment was a legitimate interest . . . served by letting him suffer and starve nearly to death, that argument fails." (Dkt. # 88 at 20.) The cases that Reeves County identifies do not suggest that a severely mentally ill pretrial detainee, like Mr. Spivey, has a right to self-harm. (See Dkt. # 66 at 8 (first citing Riggins v. Nevada, 504 U.S. 127, 134 (1992); then Washington v. Harper, 494 U.S. 210, 221 (1990); and then citing Cruzan by Crusan v. Dir. Mo. Dep't of Health, 497 U.S. 261, 278 (1990)). None of these cases is on point. In Riggins, the Court reversed the conviction of a defendant who was forced to take antipsychotic medication during his trial. 504 U.S. at 136. Plaintiff alleges that Mr. Spivey was, temporally speaking, nowhere near trial—he was on HHSC's waitlist for inpatient services to restore his competency. (See Dkt. # 33 at ¶ 65.) In Harper, the Court upheld a state

---

> generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility."

Bell, 441 U.S. at 538–39 (citation modified).

prison's policy of forcibly administering antipsychotic medications reasoning that "[t]here are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison environment, which, by definition, is made up of persons with a demonstrated proclivity for antisocial criminal, and often violent, conduct." Harper, 494 U.S. at 225 (citation modified). Rather than support Reeves County's position, the Court views this case as cutting strongly in Mr. Spivey's favor. The State has the burden (here, it belongs to Reeves County) to combat the danger a pretrial detainee like Mr. Spivey "pose[s] . . . to both himself and others" in a carceral environment like RCJ. Id. To wit, the FAC alleges that most of RCJ's staff were aware of the risks that Mr. Spivey posed to himself and others—both before and during his late-2023 to early-2024 paranoid delusions that led him to refuse meals for more than seventy consecutive days. (See Dkt. # 33 at ¶¶ 39–41, 49–60, 64–65, 87–100.) And Cruzan concerned the standard of review a court should apply when ruling to discontinue nutrition for a non-incarcerated individual in a vegetative state. See 497 U.S. at 284. It is inapplicable here.

Courts beyond the tribunal of common sense have recognized that "allowing [a detainee like Mr. Spivey] to starve himself to death would violate the obligations the [State] owes as a custodian." E.g., In re Kumar, 402 F. Supp. 3d 377, 384 (W.D. Tex. 2019) (citing Aamer v. Obama, 953 F. Supp. 2d 213, 221 (D.D.C. 2013)). What further distinguishes this case from those that Plaintiff identifies as generally supportive of their legal arguments is that Mr.

Spivey was, unlike the detainee in Kumar, not *voluntarily* refusing to eat. See id. Indeed, the Complaint alleges that Mr. Spivey was acting under schizophrenia-induced paranoid delusions—i.e., not of his own free will.[12] (See generally Dkt. # 33.)

Reeves County's contention that RCJ "did not have the facilities or medical expertise" to assist a pretrial detainee like Mr. Spivey with paranoia paranoia-induced starvation is inapposite. (See Dkt. # 66 at 8.) Moreover, Reeves County's claim "that [Mr.] Spivey had been found incompetent to stand trial is not enough to allow Reeves County to override his refusal to eat or take medication" is a slippery slope to unfounded legal conclusions. (Id. (citing United States v. Charters, 829 F.3d 479, 488–89 (4th Cir. 1987).) Reeves County asserts that Charters (a case that the Court notes is not binding authority in the Fifth Circuit) stands for the proposition that "[m]entally ill patients, though incapacitated for particular purposes, can be competent to make decisions concerning their medical care." That is not how the Court reads that case. Charters concerned an individual whom the Fourth Circuit panel determined was "almost certainly not properly in federal custody" and, unlike other cases where courts had found forced medication of a detainee or inmate to be appropriate, there was "no history of injury to Charters or injuries to other

[12] By Plaintiff's own terms, "Mr. Spivey did not have a liberty interest in refusing treatment when Reeves County knew [Mr. Spivey] lacked capacity to withhold consent." (Dkt. # 88 at 20.)

patients inflicted by Charters." 829 F.2d at 487–89, on reh'g, 863 F.2d 302 (4th Cir. 1988). This is not so with Mr. Spivey. He allegedly injured others. (See Dkt. # 33 at ¶¶ 55–56, 89 (detailing Mr. Spivey's alleged attack on two jailers).) And he allegedly injured himself. (See id. at ¶¶ 105, 111, 119, 150, 160 (alleging paranoia-induced starvation by repeatedly declining meals across a more than two-month span).)

2. Episodic Acts or Omissions

Having found that the Reeves County did not waive its challenge to Plaintiff's episodic acts or omissions claim, the Court considers the merits. See supra. First, Plaintiff has alleged that Reeves County has an official "practice of jailers' delaying or denying necessary crisis mental health assessments and services by failing or refusing to contact West Texas Centers or any other appropriate entity for those services for a detainee whose mentally illness placed only himself at serious risk of harm." (Dkt. # 88 at 24 (citing Dkt # 33 at ¶¶ 95, 97–100, 104–09, 111–14, 117, 126, 129, 136–37, 198, 203)); see Martinez, 71 F.4th at 389.

"A policy or custom may be attributed to a municipal defendant through the identification of a final policymaking authority" and the "[i]dentification of an official as a final policymaking authority is a question of state and local law." Citcheu et al. v. Travis County et al., No. 1:25-CV-01442, 2026 WL 2518009, at *5 (W.D. Tex. Aug. 21, 2026) (first quoting Garza v. City of Donna, 922 F.3d 626, 637 (5th Cir. 2019) (internal citations omitted); and

then quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988)). Here, Plaintiff has pleaded that the final policymaker for Reeves County is Sheriff Arturo Granado. (See Dkt. # 33 at ¶¶ 104–14.) She has pleaded that, as RCJ's final policymaker, Sheriff Granado "can be charged with actual or constructive knowledge" of the official practice. Martinez, 71 F.4th at 389 (quoting Pineda, 291 F.3d at 328 (internal citation omitted)); (see Dkt. # 33 at ¶¶ 104–14.)

And, finally, Plaintiff has plausibly pleaded that Mr. Spivey suffered "a constitutional violation [in Reeves County's custody at RCJ] whose 'moving force' is that policy or custom." Martinez, 71 F.4th at 389 (quoting Pineda, 291 F.3d at 328 (internal citation omitted)); (see Dkt. # 33 at ¶¶ 44–45,104–14, 117–18, 146–47, 154, 159, 160, 189, 203, 208–09.) Reeves County challenges the final prong of Plaintiff's episodic acts or omissions claim by arguing that it did not violate Mr. Spivey's right to medical care. (See Dkt. # 66 at 5–6.) More precisely, it contends that it and RCJ's staff could not have violated Mr. Spivey's Fourteenth Amendment due process rights in pretrial detention because they provided him with medical treatment for an infected ingrown toenail (as well as attempted treatment for weight loss by being offered Pedialyte). (See id.; see also Dkt. # 33 at ¶¶ 96, 101, 125.) This argument lacks merit. Cf., e.g., Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006) ("The mere delay of medical care can also constitute an Eighth Amendment violation but only if there has been deliberate indifference that results in substantial harm." (citation modified)); Sims v. Griffin, 35 F.4th 945, 952 (5th Cir. 2022)

(acknowledging that "[e]ven if a jury merely finds that the officers ignored [an inmate's] complaints or otherwise evinced a wanton disregard for his serious medical needs, then that would still be enough to support a violation of [that inmate's] rights").

In the same vein as the violations the Fifth Circuit delineated in Easter and Sims, the Court concludes that Plaintiff has carried her pleading-stage burden under Twombly and Iqbal to advance her Monell claims for unconstitutional conditions of confinement as well as episodic acts or omissions claims against Reeves County. See Twombly, 550 U.S. at 556–57; Iqbal, 556 U.S. at 678. Accordingly, because Plaintiff has pleaded "specific facts" that support her claim that Reeves County maintained an official policy or custom, and that this supplied the "moving force" behind the constitutional violations of Mr. Spivey's rights, these claims shall progress to Discovery. (See, e.g., Dkt. # 33 at ¶¶ 95–100, 104–10; 111–17, 126, 129, 136, 137, 198–207); Thompson, 183 F.4th at 372.

For similar reasons, the Court also concludes that Plaintiff's FAC sufficiently alleges a failure to train claim. (See Dkt. # 33 at ¶¶148–52, 199, 203.) She has made concrete, factual allegations from which "deliberate indifference can still be inferred if the factfinder determines that the risk of constitutional violations [in Mr. Spivey's situation] was or should have been an 'obvious' or 'highly predictable consequence' of [Reeves County's] alleged training inadequacy." See Littell v. Houston Indep. Sch. Dist., 894 F.3d 616,

624 (5th Cir. 2018) (quoting City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989)).

B. ADA and Rehab Act Claims

Plaintiff asserts claims against the County under Title II of the ADA (42 U.S.C. § 12131) and § 504 of the Rehabilitation Act (29 U.S.C § 794). (See Dkt. # 33 at ¶¶ 33, 163.) "The remedies, procedures, and rights available under Title II of the ADA are identical to those available under § 504 of the Rehab Act." Melton v. Dallas Area Rapid Transit, 391 F.3d 669, 676 (5th Cir. 2004) (citation modified); see also Est. of Derrick Ellison v. Cnty. of Bexar, No. SA-24-CV-1386, 2026 WL 1691382, at *4 n.4 (W.D. Tex. May 18, 2026) ("The difference between the [two] statutes is that the ADA applies only to public entities while the Rehab Act applies to any federally funded programs or activities. Congress passed the ADA to extend the protections of the Rehab[ ] Act to cover all programs of state or local government, and not just those receiving federal funds." (quoting Melton, 391 F.3d at 676 (citation modified)), report and recommendation adopted sub nom. Est. of Ellison v. Cnty. of Bexar, No. 24-cv-1386, 2026 WL 1688374 (W.D. Tex. June 9, 2026). Accordingly, the Court recognizes these claims' overlap and follows the Fifth Circuit's lead in consolidating its analysis of both claims. See Frame v. City of Arlington, 657 F.3d 215, 223–24 (5th Cir. 2011).

To state a claim under either statute, Plaintiff must plausibly allege "(1) that [Mr. Spivey] ha[d] a qualifying disability; (2) that he [wa]s being

denied the benefits of services, programs, or activities for which the public entity [wa]s responsible, or [wa]s otherwise discriminated against by the public entity; and (3) that such discrimination [wa]s by reason of his disability." Miraglia v. Bd. of Supervisors of La. State Museum, 901 F.3d 565, 574 (5th Cir. 2018). And both a "showing that the disability and its consequential limitations were known by the covered entity, and [that] the entity failed to make reasonable accommodations" will satisfy the third prong. Carter as next of friend of Carter v. City of Shreveport, 144 F.4th 809, 814 (5th Cir. 2025).

A County jail's duty to accommodate does "not require prisons to provide *new* services or programs for disabled prisoners," but it does obligate them to "make reasonable modifications so that a disabled prisoner can have meaningful access to *existing* public services or programs." Cleveland v. Gautreaux, 198 F. Supp. 3d 717, 736 (M.D. La. 2016) (citation modified) (emphasis in original). "An accommodation is reasonable if it does not impose undue financial or administrative burdens or fundamentally alter the nature of the service, program or activity." Smith v. Harris Cnty., 956 F.3d 311, 317 (5th Cir. 2020).

Here, as in Ellison, Plaintiff alleges that Reeves County discriminated against Mr. Spivey on the basis of his disability. Cf. Ellison, 2026 WL 1691382, at *5. Specifically, Plaintiff claims that, from the moment he arrived at RCJ, "[Mr.] Robert Spivey was an individual with a disability—specifically schizophrenia severe enough to render him competent to stand trial

and cause him to starve himself—who was qualified to access [RCJ]'s goods [*sic*] and programs."[13] (Dkt. # 88 at 8 (citing Dkt. # 33 at ¶¶ 37, 65, 104–08, 163–65, 174–79).) For the purposes of its Motion, Reeves County concedes that Mr. Spivey qualifies as an individual with a disability. (See Dkt. # 66 at 4); Miraglia, 901 F.3d at 574. And Plaintiff alleges that RCJ staff knew of Mr. Spivey's disability from his status in CCQ as well as his attack on two officers, repeated comments about his paranoia-induced delusions and his paranoia-driven starvation. (See Dkt. # 33 at ¶¶ 39–41, 49–60, 64, 87–100); Carter, 144 F.4th at 814. But see, e.g., Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 165 (5th Cir. 1996) (noting it "is often the case when mental disabilities are involved" that "the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent"). The question then is whether, under Twombly and Iqbal, Plaintiff has sufficiently pleaded that Reeves County denied Mr. Spivey the benefits of RCJ's existing programs *and* that it did so because of his disability. See Miraglia, 901 F.3d at 574. At this early stage in the litigation, the Court concludes Plaintiff has met her burden in the FAC. Below, it explains why.

* * *

In its Motion to Dismiss (Dkt. # 66), Reeves County counters Plaintiff's discrimination claims by arguing that "[t]here is no factual allegation

---

[13] The Court understands the Plaintiff as having meant to say "services."

that at any time Mr. Spivey needed or requested food, fluids, medical care or mental health care at [RCJ he] was refused or purposely or intentionally delayed." (Id. at 7.) Again, the County misreads the governing law.[14] In terms of the Fifth Circuit's precedential cases defining the scope of an entity defendant's liability for ADA and Rehab Act claims, Plaintiff occupies the heartland of plausible claims for relief. See Carter, 144 F.4th at 814; Smith, 956 F.3d at 317; Miraglia, 901 F.3d at 574.

As a threshold matter, Plaintiff has alleged that Reeves County excluded Mr. Spivey from RCJ's programs and services. Although she makes these reasons most clear in her memorandum of law (see Dkt. # 88 at 9–10), they abound within the four corners of the FAC. (See, e.g., Dkt. # 33 at 104–119, 125–26, 138, 145, 154, 165–70, 181–82.) Included in these allegations is that Reeves County denied Mr. Spivey access to, *inter alia*: food, routine and crisis mental health services, safe housing, and medication. (See id.) To support her claims, Plaintiff identifies a case from another Division of this Court where a defendant municipality's request to dismiss ADA and Rehab Act claims was denied because she had "adequately alleged facts to show that she was

---

[14] Consider, for instance, a Deaf detainee and a jailhouse fire igniting in the middle of the night. By the terms of the County's argument, neither Supreme Court nor Fifth Circuit precedent would permit liability where a Deaf detainee is injured after jail staff fail to do anything more in response to the jailhouse fire than shouting at the detainees to evacuate after unlocking all the cells. The Court does not read the aforementioned authorities in ways that would create such extreme, unintended results.

disabled by her mental illness, that the Defendants knew of her disability, and that county or [its contracted mental healthcare] personnel failed to provide mental health care during her detention." Forster v. Bexar Cnty., No. 21-CV-00765, 2022 WL 2820857, at *33 (W.D. Tex. July 19, 2022). There, as here, "the Court can reasonably infer that [Reeves County] at least had actual notice of the alleged ADA/R[ehab] A[ct] violation." Id.

Plaintiff also identifies another persuasive authority from a Court within this Division where the entity defendant's motion to dismiss an ADA claim was denied. See Baker v. Armstrong, No. 16-CA-303, 2017 WL 11717658, at *4 (W.D. Tex. June 22, 2017). There, the Plaintiff alleged that the Texas Department of Criminal Justice–Correctional Institutions Division (TDCJ–CID) did not provide him 'adequate" food after his gastric bypass surgery. See id. The Court denied TDCJ–CID's motion to dismiss because, it reasoned:

> Plaintiff has alleged that he is a qualified individual because he asserts his alleged eating disability prevents him from consuming adequate food in the time allotted for meals without extreme pain. Further, Plaintiff has alleged he was denied the benefit of adequate food. Finally, Plaintiff has alleged that the denial of adequate food was because of his disability. Even though Defendants refuse to issue or honor slow-eating passes throughout the Hughes Unit, Plaintiff alleges that the effect of this on Plaintiff, because of his disability, is that he is denied adequate food. Just because no inmates are allowed to use an elevator, for example, does not mean that an inmate who cannot climb stairs could not state a claim that his access to different floors was restricted because of his disability.

Id. at *4; see also Estrada v. Dir., TDCJ-CID, No. 5:20-CV-00030, 2022 WL 16919789, at *8 (N.D. Tex. Nov. 14, 2022) (denying an entity defendant's motion to dismiss incarcerated plaintiff's claims that defendant violated the ADA and Rehab Act by failing to accommodate his housing to account for PTSD, paranoia, and anxiety, which he claims substantially limited his ability to sleep, think, and communicate"), aff'd sub nom. Estrada v. Tex. Dep't of Crim. Just.-Corr. Institutions Div., No. 22-11202, 2023 WL 4106449 (5th Cir. June 21, 2023).

Reeves County argues that these cases "do not fit the facts here" and insists that "the facts alleged by Plaintiffs [*sic*] demonstrate a jail staff doing all they can to get Spivey to eat, take medication and get medical help, which he refused repeatedly." (Dkt. # 90 at 3.). This is plainly not what the FAC alleges. (See Dkt. # 33 at ¶¶ 92–95 (alleging that "Mr. Spivey put in a medical request . . . that he no longer wanted to take his psychotropic medications" and that "LVN Lozano responded to the . . . request by telling Mr. Spivey that his psychotropic medications would no longer be re-ordered at his request").) In addition, he was able to discontinue his medication without any notice provided to the prescribers (West Texas Centers). (See id.) The allegations in the FAC sufficiently plead that Reeves County excluded Mr. Spivey from its programs and services. (See id.)

The next question is whether Reeves County's exclusion of Mr. Spivey from its programs and services amounts to intentional discrimination.

Cf. Miraglia, 901 F.3d at 574. For reasons discussed above, Reeves County gestures that it did not exclude Mr. Spivey on account of his disability because, "despite the [RCJ] staff's best efforts[, Mr.] Spivey became increasingly uncooperative and refused the treatment and food that was repeatedly offered him." (Dkt. # 66 at 7.) Yet these are the *very* symptoms of the schizophrenia that Plaintiff alleges Mr. Spivey to have suffered (and which were manifest) during his time in the County's custody. (See generally Dkt. # 33.) Plaintiff counters that the RCJ's failure to provide Mr. Spivey with the requisite "reasonable accommodations" for him to "meaningfully access the jail's program and services" amounts to intentional discrimination against him. (Dkt. # 88 at 11–12 (citing Dkt. # 33 at ¶¶ 86, 147–52, 171–73, 183, 186).)

What would a reasonable accommodation for Mr. Spivey have looked like in this case? Plaintiff offers several—all of which the Court views as supported by case law. For instance, Plaintiff urges that RCJ should have "obtain[ed] a crisis mental health evaluation and services for Mr. Spivey when he stopped eating." (Id. at 12); see, e.g., Dotson, 2019 WL 6311375, at *2, *7–8 (denying motion to dismiss of ADA and Rehab Act claims where over the course of "150 days, [pretrial detainee] was seen by at least thirty-two (32) different UHS employees or contractors, including at least once by Defendant Yao, for a total of 494 times—on average, over three (3) times per day" and "refused meals at least 102 times). Additionally, Plaintiff asserts that the County could have expressed to West Texas Centers or the physicians who saw

him during the January 12 emergency room visit that Mr. Spivey was refusing food because of his paranoid delusions. (Dkt. # 88 at 12.) And, finally, Plaintiff asserts that Mr. Spivey could have been reasonably accommodated were RCJ's staff equipped with the requisite training to identify and initiate (not themselves administer) medical treatment. (See id.)

In further support of Plaintiff's claim that RCJ could have provided (but intentionally chose not to provide) Mr. Spivey with reasonable accommodations *because* of his disability, Plaintiff identifies several Fifth Circuit cases. First, she points to Cadena v. El Paso County. 946 F.3d 717 (5th Cir. 2020). The Cadena Court reversed a district court's dismissal of a pretrial detainee's ADA claim. Id. at 721. It held that the pretrial detainee with a mobility issue had pleaded an ADA claim of intentional discrimination where she asked for a wheelchair the day after leg surgery but was instead given only crutches. See id. at 721–22. It reasoned that "[i]n practice, this court has affirmed a finding of intentional discrimination when a county deputy knew that a hearing-impaired suspect could not understand him, rendering his chosen method of communication ineffective, and the deputy made no attempt to adapt." Id. at 724 (quoting Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 575–76 (5th Cir. 2002)). The Cadena Court also recounted how a claim for intentional discrimination can lie when "the evidence indicated that "on several occasions, an interpreter was requested but not provided, and one of the forms of communication that a hospital used to speak with a hearing-impaired patient

was often ineffective." Id. (quoting Perez v. Doctors Hosp. at Renaissance, Ltd., 624 F. App'x 180, 185 (5th Cir. 2015) (citation modified)). Here, the Court observes that Cadena is congruent with Plaintiff's claims as she alleges them in the FAC. (See Dkt. # 33 at ¶¶ 86, 147–52, 171–73, 183, 186).) As in Cadena, Plaintiff has sufficiently pleaded the intentional discrimination element of an ADA claim. Cf. Cadena, 946 F.3d at 721–22.[15]

II. Individual Jailer Defendants (Count III: 42 U.S.C. § 1983)

Plaintiff alleges that the Individual Jailer Defendants violated Mr. Spivey's Fourteenth Amendment right to receive mental health care and adequate nutrition as a pretrial detainee. (Dkt. # 33 at ¶ 211.) Specifically, she alleges that "while acting under color of law, [each Individual Jailer Defendant] subjectively knew that Mr. Spivey was suffering an objectively serious mental illness and experiencing obvious symptoms including paranoia that prevented him from eating or consuming adequate nutrition." (Id. at ¶ 212.) And, armed with such knowledge, they "were each deliberately indifferent to their duties under the Constitution and deprived Mr. Spivey of his right to treatment of his serious mental health issues." (Id. at ¶ 217.)

[15] To the extent that Plaintiff highlights how Mr. Spivey alleged suffered pain not inflicted on other, presumably non-disabled detainees because of his disability, the Court does not deem it necessary for this claim to withstand the County's Motion to Dismiss and so does not address it. (See Dkt. # 88 at 14–15.)

Individual Jailer Defendants counter that Plaintiff's FAC should fail under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim. This is because the Individual Jailer Defendants assert qualified immunity, which they posit bars Plaintiff's claims against them. (See Dkt. # 65 at 1.)

As it must when faced with a defense of qualified immunity, the Court begins its analysis there. See Lincoln v. Turner, 874 F.3d 833, 847 (5th Cir. 2017).

A. Qualified Immunity

The qualified-immunity doctrine insulates state actors from liability for their wrongful actions "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lincoln, 874 F.3d at 847 (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).[16] Any defendant's invocation of qualified immunity on a Rule 12(b)(6) motion shifts "the burden . . . to the plaintiff to demonstrate the inapplicability of the defense." Id. (quoting Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 194 (5th Cir. 2009)).

To overcome a defendant's assertion of qualified immunity, the Supreme Court has held that the plaintiff must "show[] (1) that the official

[16] At the outset of the qualified immunity analysis, the Court notes that neither the Supreme Court nor the Fifth Circuit requires that a court in this Court's position "limit [its] analysis to the cases cited by Plaintiffs." Joseph on behalf of Est. of Joseph v. Bartlett, 981 F.3d 319, 338 (5th Cir. 2020); Elder v. Holloway, 510 U.S. 510, 516 (1994).

violated a statutory or constitutional right, and (2) that the right was clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)) (citation modified). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. at 11–12 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012) (citation modified)). Moreover, "[the Supreme Court] do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 12 (quoting Al-Kidd, 563 U.S. at 741); see Zorn v. Linton, 146 S. Ct. 926, 930 (2026) ("[O]fficers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'known' that it proscribed their specific conduct." (quoting City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 616 (2015))) (citation modified). And, finally, the Fifth Circuit has construed the Supreme Court's precedents to affirm that "[q]ualified immunity does not operate at a high level of generality" because such a contention would enable plaintiffs "to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Lincoln, 874 F.3d at 850 (citation modified).

1. LVN Lozano and Sergeant Gabaldon

a. *Plaintiff has Sufficiently Pleaded that LVN Lozano and Sergeant Gabaldon Violated Mr. Spivey's Constitutional Rights*

To be sure, "[t]he Eighth Amendment prohibits deliberate indifference to a prisoner's medical needs, while the Fourteenth Amendment['s Due Process Clause] prohibits deliberate indifference to a pretrial detainee's medical needs." Ford v. Anderson Cnty., 102 F.4th 292, 307 n.5 (5th Cir. 2024) (citing Cleveland v. Bell, 938 F.3d 672, 676 (5th Cir. 2019)). The Fifth Circuit recognizes "no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." Gibbs v. Grimmette, 254 F.3d 545, 548 (5th Cir. 2001). It has also held that "psychological or psychiatric condition[s] can be as serious as any physical pathology or injury." Partridge v. Two Unknown Police Officers of City of Houston, 791 F.2d 1182, 1187 (5th Cir. 1986). And it has promulgated (and reaffirmed) rules of decision that permit claims to proceed against an officer where he or she "knows of and disregards an excessive risk to inmate health or safety." Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006); see also Sims v. Griffin, 35 F.4th 945, 951–52 (5th Cir. 2022) (outlining Fourteenth Amendment right to medical care while incarcerated (citing Easter, 467 F.3d 459)); Kelson v. Clark, 1 F.4th 411, 421 (5th Cir. 2021) (reaffirming pretrial detainees' Fourteenth Amendment rights to medical care).

First, Plaintiff alleges that both LVN Lozano and Sergeant Gabaldon received reports of Mr. Spivey's rapidly deteriorating condition. For instance, Plaintiff alleges that on July 23, 2023, both individuals received two memoranda from other RCJ Jailers concerning Mr. Spivey's changed condition on July 23, 2023. (See Dkt. # 33 at ¶¶ 87–89.) Officers Irving Molina and Javier Avila each allegedly sent a memorandum to LVN Lozano and Sergeant Gabaldon apprising them of the jailers' concern for Mr. Spivey's change in condition. (See id.) Per Plaintiff's FAC, neither memorandum spurred *either* LVN Lozano *or* Sergeant Gabaldon to act. (See generally Dkt. # 33.) Both Defendants' receipt of the other Jailers' memoranda, coupled with their purported failure to do anything in response, indicate that Plaintiff has sufficiently alleged that LVN Lozano and Sergeant Gabaldon both "kn[ew] of and disregard[ed] an excessive risk to [Mr. Spivey's] health or safety." See Easter, 467 F.3d at 463.

Yet, should there be any further doubts as to whether LVN Lozano's and Sergeant Gabaldon's alleged receipt of the July 23, 2023, memoranda was enough to put either or both Defendant's on notice of "excessive risk to [Mr. Spivey's] health or safety," the Court concludes that both Defendants' alleged subsequent actions or omissions permit Plaintiff's claims against them to proceed to discovery. Consider Plaintiff's allegation that LVN Lozano told Mr. Spivey, whom she previously knew to be diagnosed with schizophrenia and suffer from paranoid delusions, that she would not be

renewing his psychotropic medications in October 2023. (See id. at ¶¶92–95.)[17] That she did this *without any consultation with or notice to his mental healthcare providers* from West Texas Centers meets the high standard for deliberate indifference. (See, e.g., Domino v. Tex. Dep't of Crim. Just., 239 F.3d 752, 756 (5th Cir.2001) ("Deliberate indifference is an extremely high standard to meet.").

Still additional allegations in Plaintiff's FAC support the Court's conclusion that Plaintiff has sufficiently alleged a constitutional violation on her deliberate indifference claims against LVN Lozano and Sergeant Gabaldon. The lack of information that LVN Lozano allegedly provided to the hospital during Mr. Spivey's January 12, 2024, trip to the emergency room is itself a symptom of her alleged deliberate indifference. (See id. at ¶¶ 132–34.) As discussed above, by January 12, it is alleged that Mr. Spivey had been refusing food for *over two months*. (See generally Dkt. # 33.) And, per the Court's reading of the controlling law, Plaintiff's allegation that LVN Lozano's failure

[17] Although the Court notes Plaintiff's allegation that Defendant Bonnie Valles also received Mr. Spivey's request to discontinue his psychotropic allegations (see id. at ¶¶ 92–93), there is nothing more in the FAC that alleges Valles had any duty to interrupt or otherwise stop LVN Lozano's processing of Mr. Spivey's request. (See id. (alleging "Defendant LVN Lozano was the jail's medical officer" and that, as such, "[s]he received medical requests from detainees, maintained the jail's medical files, and was the primary person responsible for ensuring detainees' medications were administered and submitted for refills, among other duties").)

to inform emergency medical personnel of Mr. Spivey's medical history lies at the heartland of deliberate indifference to a pretrial detainee's medical needs. See, e.g., Easter, 467 F.3d 459; Sims, 35 F.4th at 951–52; Clark, 1 F.4th at 421.

b. *Mr. Spivey's Constitutional Rights Were Clearly Established at the Time Plaintiff Alleges LVN Lozano and Sergeant Gabaldon Violated Them*[18]

The Fifth Circuit has repeatedly underscored what the Supreme Court had previously in Estelle v. Gamble and Farmer v. Brennan applies to pretrial detainees' rights to adequate receive adequate medical care.[19] Sims, 35 F.4th at 951–52; Cope v. Cogdill, 3 F.4th 198, 206–07 (5th Cir. 2021). The Fifth Circuit has also identified rules of decisions addressing a prisoner's Eighth Amendment rights as similarly establishing a pretrial detainee's rights to medical care and to be free from his jailers' deliberate indifference to his serious medical needs. E.g., Sims v. City of Jasper, 117 F.4th 283, 289 (5th Cir. 2024) (holding that the Fourteenth Amendment ensures pretrial detainees' freedom from deliberate indifference and noting that anything that "[i]nflict[s] punishment on pretrial detainees . . . violates the Fourteenth Amendment's Due

---

[18] As the Court observed supra, at n.16, the cases that clearly establish the relevant rights need not have been identified by Plaintiff. The Court has an independent obligation to identify the controlling law that defines the constellation of rights. E.g., Bartlett, 981 F.3d at 338; Holloway, 510 U.S. at 516.

[19] See Estelle, 429 U.S. 97, 103 (1976); Farmer, 511 U.S. 825, 832–33 (1994).

Process Clause"); Sims, 35 F.4th at 951–52 (determining that, as of 2006, the Fifth Circuit had clearly established a detainee's Fourteenth Amendment right to medical care while incarcerated (citing Easter, 467 F.3d 459)); Clark, 1 F.4th at 421 (collecting Fifth Circuit decisions about convicted defendants' Eighth Amendment rights, including Easter, and holding those cases clearly established a pretrial detainee's Fourteenth Amendment rights to medical care while in detention)). Critically, if there was any doubt about whether any pre-Easter case put LVN Lozano or Sergeant Gabaldon on notice, both Sims and Clark clearly established pretrial detainees' constitutional rights *before* Mr. Spivey's alleged November 2023 to January 2024, period of paranoia-induced refusal of food.[20]

Thus, the Court concludes that the authorities discussed—both Partridge (from 1986) and more recent decisions like Easter, Clark, and Sims (from 2006, 2021, and 2022, respectively) clearly established pretrial detainees' rights to adequate medical care and to be free from deliberate indifference to their serious medical needs by the time of Mr. Spivey's mental health-induced starvation at RCJ. By virtue of each case, as well as all of them collectively, LVN Lozano was on notice that a medical professional in her position charged with providing medical care to pretrial detainees could be held personally liable for violating her pretrial-detainee patients' constitutional right to, among other things, receive adequate medical care and be protected from starvation.

[20] The Court reads Partridge and Easter as clearly establishing the same rights decades before the alleged conduct here.

Accordingly the Court **DENIES** the Individual Jailer Defendants' Motion to Dismiss Plaintiff's claims against LVN Lozano and Sergeant Gabaldon in their individual capacities.

2. Remaining Individual Jailer Defendants

a. *Plaintiff's FAC Does Not Allege that the Remaining Individual Defendants Violated Mr. Spivey's Constitutional Rights, But the Court Concludes that Even If They Did, Such Rights Were not Clearly Established*

Because the Supreme Court has instructed lower federal courts that they may analyze the two prongs of the qualified immunity analysis in either order, the Court begins with the clearly established prong her. See Luna, 577 U.S. at 11. Plaintiff cites two Fifth Circuit cases for the proposition that it had been "clearly established" that the Individual Jailer Defendants "could not do what they did here—that is, do nothing to get [Mr Spivey] the care they desperately needed for over two months." (Dkt. # 84 at 12–13 (first citing Fielder v. Bosshard, 590 F.2d 105, 107–08 (5th Cir. 1979); and then citing Dyer v. Houston, 964 F.3d 374, 378 (5th Cir. 2020)).)

In Fielder, the Fifth Circuit held that the conduct of jailers who threw food that a pretrial detainee's mother had brought him onto the cell floor— "like he was feeding a bunch of hogs"—demonstrated a state of culpability that transcended "merely unmindful or negligent prison officials." 590 F.2d at 107–08. In Fielder, the Court upheld a jury verdict against defendant jailers on the grounds that:

> Each of these four appellants knew of the extremity of [the pretrial detainee's] illness. Their defense was based in part upon the contention that [he] was a known heavy drinker and that they thought he was exhibiting the symptoms of delirium tremens. However, both the severity of the apparent illness and the appellants' off-hand, callous comments with respect to [the pretrial detainee's] welfare belie the theory that they merely misdiagnosed a prisoner's sickness. There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help.

Id. at 108. Like Fielder, the facts alleged in Plaintiff's FAC are tragic.[21] To the Court, however, the *legal* similarities between Fielder and this case go no further. This case lacky any indicia of a culpable mental state (beyond negligence, perhaps) on behalf of the remaining Individual Jailer Defendants. (See generally Dkts. # 33; 65 at 2–9.)[22] As alleged, no allegation in the FAC that concerns these Defendants comes close to approximating the facts in

[21] The Court extends its sympathies to Plaintiff and recognizes the desire to hold anyone and everyone who may have been involved in her son's confinement and alleged deterioration at RCJ accountable and secure a sense of justice to her son. The following paragraphs of this section explain why the law does not permit the claims against the remaining Individual Jailer Defendants to progress to discovery. See infra.

[22] It is well-settled that a defendant's negligence—and even gross negligence—in the context of deliberate indifference claims fall within qualified immunity's powerful, Aegis-like shield. See, e.g., Thompson v. Upshur Cnty., 245 F.3d 447, 459 (5th Cir. 2001) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."); Brewer v. Hayne, 860 F.3d 819, 825 (5th Cir. 2017) ("[N]egligence alone will not defeat qualified immunity." (citation omitted)).

Fielder. Cf. 590 F.2d at 107–08. For example, Plaintiff does not allege any specific factual allegation in her FAC that *any* Defendant other than LVN Lozano and Sergeant Gabaldon acted with deliberate indifference to Mr. Spivey's condition. (See Dkt. # 33.) And, even if Plaintiff's FAC plausibly alleges claims against Individual Jailer Defendants for their acts or omissions vis-à-vis Mr. Spivey, it is not at all clear to the Court that such conduct surpasses ordinary negligence. See Brewer, 860 F.3d at 825; see also Campbell v. City of San Antonio, 43 F.3d 973, 977 (5th Cir. 1995) ( "[T]he negligent act of a state official which results in unintended harm to life, liberty, or property, does not implicate the Due Process Clause.").

The Court similarly concludes that Dyer is inapposite as to the remaining Individual Jailer Defendants. In that case, the Fifth Circuit affirmed a district court's denial of summary judgment to officers on claims that "[they] were deliberately indifferent to the serious medical needs of a detainee in their custody." Dyer, 964 F.3d at 381. Specifically, the Court reasoned that "[a] reasonable trier of fact could find that [defendant] Officers were aware that [the pretrial detainee], in the grip of a drug-induced psychosis, struck his head violently against the interior of [the Officer's] patrol car over 40 times en route to jail and thereby sustained severe head trauma." Id. at 381–82. Here, Plaintiff argues that, similar to the defendant officers in Dyer, qualified immunity should not shield Individual Jailer Defendants because they had more than two months to observe and report on drastic changes in Mr. Spivey's behavior. (See Dkt.

# 84 at 13.) However, the test for clearly established law is whether "a reasonable person would have known" she was violating another's constitutional rights through her conduct. Luna, 577 U.S. at 11–12; see Lincoln, 874 F.3d at 847. Despite Plaintiff's best efforts, the Court does not see how anyone in the remaining Individual Jailer Defendants' shoes would know that not doing anything more—especially in light of knowledge that Officers Avila and Molina had previously informed LVN Lozano and Sergeant Gabaldon of the changes in his condition—would lead to them violating Mr. Spivey's constitutional rights. (See Dkt. # 33 at ¶¶87–89). Plaintiff has thus not met her burden to demonstrate that the Mr. Spivey's rights were clearly established as to the remaining Individual Jailer Defendants. Cf. Lincoln, 874 F.3d at 847 (noting that a defendant's invocation of qualified immunity shifts the burden to Plaintiff to demonstrate that the defense does not apply).

* * *

In short, Plaintiff implies that the remaining twenty-six Individual Jailer Defendants (the original twenty-eight named minus LVN Lozano and Sergeant Gabaldon) are liable in their personal capacities for failing to do more to help Mr. Spivey. Although the evidence produced in discovery may or may not establish that failures existed at multiple levels within RCJ and between all or almost all of the Individual Jailer Defendants, nothing in the FAC has specifically alleged plausible facts that state claims for deliberate indifference as

to the remaining Individual Jailer Defendants.[23] See Twombly, 550 U.S. at 556–57; Iqbal, 556 U.S. at 678. And Plaintiff has not plausibly alleged these Defendants violated one or more of Mr. Spivey's clearly established constitutional rights through their conduct. See al-Kidd, 563 U.S. at 735. Therefore, and as matters of law at the motion to dismiss stage, the remaining Individual Jailer Defendants are entitled to qualified immunity. In the words of a recent decision from the U.S. Court of Appeals for the Sixth Circuit, even when a "case presents us with an unspeakable tragedy . . . [the Court] must ask how those heartbreaking allegations settle within our constitutional framework." See Zimmermann v. Labish, --F.4th--, 2026 WL 2529819, at *1 (6th Cir. Aug. 27, 2026). Ultimately, because the allegations against the remaining Individual Jailer Defendants do not "settle within our constitutional framework" as currently defined by Supreme Court and Fifth Circuit precedent, the Court has no discretion but to conclude that qualified immunity bars Plaintiff's claims

[23] On this score, Plaintiff attempts to clarify that she "does not allege any of the Individual Jail Defendants should have personally force-fed her son; rather, they were obligated to contact the entity that could provide or initiate involuntary treatment like West Texas Centers or a medical hospital actually informed of the cause of Mr. Spivey's weight loss." (Dkt. # 84 at 18 n.8 (citing Dkt. # 33 at ¶ 154).) Under Twombly's and Iqbal's standards, however, the Complaint does not allege plausible facts that outline that anyone other than LVN Lozano, whom Plaintiff alleges was in charge of medical care "at all relevant times," or Sergeant Gabaldon (whom Plaintiff alleges received reports from and memoranda concerning Mr. Spivey's changed conditions yet failed to respond to Mr. Spivey's psychiatric medical needs) acted in a way that a reasonable officer would know violated his clearly established constitutional rights. (See, e.g., Dkt. # 33 at ¶¶ 22, 87–93, 99–100); Lincoln, 874 F.3d at 847.

against Dylan Montanez, Juan Munoz, James Thomas, Mariana Arpero, Ashley Diaz, Xavier Martinez, Irving Molina, Karla Munoz Zubia, Erika Soler, Estrella Vasquez, Suany Castillo-Solano, Jackson Steiner, Isaiah Jurado, Justice Purcel, Yvonne Valles, Alba Saenz, Aida Contreras, Eric Dominguez, Rebecca Gonzalez, Patricia Hill, Alejandro Lazcano, Veronica Martinez, Miray Rodriguez, Idaly Sanchez Molina, Oscar Solis, and Samuel Urias. The Court thus **GRANTS** the Individual Defendant Jailers' Motion to Dismiss as to those individuals (Dkt. # 65).

III. HHSC (ADA Claim) and Defendant Young (42 U.S.C. § 1983 Claim)

In its Motion to Dismiss (Dkt. # 63), HHSC argues that Plaintiff's claim against it must fail because (1) she lacks standing, (2) HHSC has sovereign immunity, and (3) she fails to state a claim for relief against HHSC under Title II of the ADA. (Dkt. # 63 at 14–16.) Similarly, both HHSC and Defendant Young argue that Plaintiff's claim about Mr. Spivey's "possible impairment to his criminal defense" are not cognizable and, therefore, run afoul of the Supreme Court's requirement that "[a]llegations of possible future injury' are not sufficient to establish Article II's requirement for a concrete, particularized injury." Id. at 14 (quoting Clapper, 568 U.S. at 409 (citation modified)).[24] Because standing and sovereign immunity are jurisdictional in

[24] After detecting a discrepancy in the Attorney General's memorandum, the Court located the source of the quote that the General cited in his brief. Whereas the brief indicated it came only from Arkansas v. Whitmore, the quoted text is from Clapper v. Amnesty International, which itself quotes Whitmore.

nature, the Court begins there. See Warnock v. Pecos Cnty., 88 F.3d 341, 343 (5th Cir. 1996); Freeman, 556 F.3d at 334; see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101–02 (1998) (urging lower federal courts to first address the "antecedent question" of "Article III jurisdiction" and reiterating that, "for a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act *ultra vires*").

Plaintiff alleges that HHSC is responsible for Mr. Spivey's mental and physical decompensation while he was in pretrial detention at Reeves County Jail. (See, e.g., Dkt. # 33 at ¶¶231–32; see also id. at ¶¶ 247–249, 249a–j (alleging "compensatory damages against all Defendants and punitive damages against all Defendants other than Reeves County and HHSC," which include damages for "past and future physical pain and mental anguish; past and future loss of enjoyment of life; past and future disfigurement; past and future impairment; past and future lost wages and lost earning capacity; [and] past and future medical expense"). As to HHSC, Plaintiff FAC alleges that the damages Mr. Spivey incurred ultimately stem from his placement on an unconstitutionally long list for competency restoration that HHSC managed. (See id. at ¶¶ 220–34.) But for his placement on the list that HHSC maintained—and because HHSC was the state entity charged with restoring Mr. Spivey to competency post-IST designation—Plaintiff alleges that she has Article III standing to sue HHSC. (See Dkt. # .) If HHSC's policy had not

resulted in Mr. Spivey being placed in prolonged pretrial detention, the theory goes, then he would not have been exposed to Reeves County's and RCJ officials' constitutionally tortious conduct. (Cf. id.) Notably, however, "[e]ven though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation,'" the plaintiff's alleged injury "can't be 'the result of the independent action of some third party not before the court.'" Inclusive Communities Project, Inc. v. Dep't of Treasury, 946 F.3d 649, 655 (5th Cir. 2019) (first quoting Bennett v. Spear, 520 U.S. 154, 169 (1997); and then quoting id. at 167).

The Inclusive Communities Court (and, before it, the Supreme Court in Bennett) anticipated that attenuated causal claims like Plaintiff's against HHSC (and Defendant Young, see infra) would create issues as to traceability. Here, Plaintiff's claims against HHSC and the Defendant Young are, technically, parties before the Court. Nonetheless, the injuries Mr. Spivey allegedly suffered by HHSC and Defendant Young are, by degree, far afield from the alleged (and now adjudged, see Ward, 2026 WL 1974743, at *39, 45) constitutional injuries that IST pretrial detainees suffer by virtue of prolonged pretrial confinement in Texas jails rather than maximum security state hospitals. The Court is satisfied there is a traceability problem. Cf. Inclusive Communities, 946 F.3d at 655; Murthy v. Missouri, 603 U.S. 43, 70 (2024)

("Th[e] failure to establish traceability for past harms . . . 'substantially undermines [the plaintiffs'] standing theory.'" (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411 (2013))).

For example, Plaintiff's FAC makes clear that Mr. Spivey's injuries are squarely the result of individuals' and entities' alleged violations of federal statute (e.g., Title II of the ADA and § 504 of the Rehab Act) and constitutional violations (e.g., Monell claims for violations of Plaintiff's Fourteenth Amendment rights). See supra Sections I–II (discussing these claims against the Individual Jailer Defendants and Reeves County). To the extent that he alleges HHSC's policy kept him detained for an unconstitutionally long period of time, that may be so. And, as it must at the Rule 12(b)(1) motion, the Court takes all well-pleaded facts as true and makes "all reasonable inferences . . . in the plaintiff's favor." Haverkamp v. Linthicum, 6 F.4th 662, 668–69 (5th Cir. 2021). There is, of course, a fine line between causation for standing purposes and causation for cause of action purposes. See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."); see also Nat'l Press Photographers 'v. McCraw, 90 F.4th 770, 784 (5th Cir.) ("To establish traceability, Plaintiffs must show a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent

action of some third party not before the court." (citation modified)), cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins, 145 S. Ct. 140 (2024). Although Plaintiff's claims toe that line, they stay on the side of the result of a third party's "independent action." See id.; Inclusive Communities, 946 F.3d at 655. Plaintiff does not allege, for example, that Mr. Spivey's mental illness worsened *because* he was in jail for longer as a result of HHSC's unconstitutional policy. (See generally Dkt. # 33.) Instead, the allegations are that Reeves County and Individual Jailer Defendants' acts, omissions, failure to train, deliberate indifference, and intentional discrimination against Mr. Spivey because of his preexisting disability each violated his rights and, critically, *those courses of alleged conduct* during his pretrial detention at RCJ—*not* the temporal duration of his stay—caused his injury. Compare, e.g., id. at ¶¶ 219–34 (pleading claims against HHSC), with id. at 162–218 (pleading claims against Reeves County and the Individual Jailer Defendants).)[25] As pleaded, the injuries alleged and the relief requested in the FAC are traceable to Reeves County and the Individual Jailer Defendants. See Spokeo, 578 U.S. at 338.

[25] Again, the Court underscores the dissimilarity between the injury pleaded here as traced to HSSC and Defendant Young and the injury pleaded—and adjudged—in Ward. Cf. Ward, 2026 WL 1974743, at *39, 45 (concluding that the class's alleged injury of prolonged pretrial detention was itself an injury that gave rise to declaratory and equitable relief against HHSC and its Commissioner). In this case, Plaintiff cannot sufficiently trace Mr. Spivey's alleged injuries to the temporal limits of his pretrial detention. See supra.

Under Article III standing doctrine, they trace neither to HHSC nor to Defendant Young.

Of course, as this Court discussed in Ward and as it noted at the outset of this opinion, the de facto reality for many mentally ill individuals in the State of Texas is that they arrive first to a jail rather than a mental healthcare facility. It is not a bug but a feature of the system. See Hergert, supra note 3, at 95–108 (detailing HHSC's "Forensic Clearinghouse Waiting List" from its origins to recent years and explaining why "jail is not a place for severely mentally ill people to be held for the purpose of regaining competency").

Thus, rather than assume hypothetical jurisdiction, which the Supreme Court has urged lower courts like this one not to do in even stronger terms than it has opined on the causal links of traceability for Article III standing, the Court will stay its hand and dismiss these claims. See, e.g., Steel Co., 523 U.S. at 101 ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning. Much more than legal niceties are at stake here." (first citing Muskrat v. United States, 219 U.S. 346, 362 (1911)); and then citing Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792)).

* * *

For the same reasons that the Court dismisses the claim against HHSC, it must also dismiss the claim against Defendant Young. See supra. To wit, as pleaded, the FAC does not enable the Court to assure itself that it

possesses subject matter jurisdiction over Plaintiff's claims against Defendant Young. See United States v. Pedroza-Rocha, 933 F.3d 490, 493 (5th Cir. 2019) ("This court has a continuing obligation to assure itself of its own jurisdiction . . . ."). Accordingly, it cannot reach the merits on the claim and must dismiss it.[26]

## CONCLUSION

For the reasons above, Defendants HHSC's and Cecile Erwin Young's Motion to Dismiss (Dkt. # 63) is **GRANTED** and Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**. Individual Jailer Defendants' Motion to Dismiss (Dkt. # 65) is **GRANTED IN PART AND DENIED IN PART**. It is **DENIED** as to LVN Lozano and Sergeant Gabaldon but **GRANTED** as to all other named Defendants and **DISMISSED WITH PREJUDICE**. And Defendant Reeves County's Motion to Dismiss (Dkt. # 66) is **DENIED**.

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, September 10, 2026.

David Alan Ezra
Senior United States District Judge

[26] Still, Plaintiff has the ability to replead. See, e.g., Mitchell v. Bailey, 982 F.3d 937, 944 (5th Cir. 2020) ("[A]ny dismissal predicated on [12(b)(1)] must be without prejudice.").